Edward J. BROWN, Plaintiff–Appellee,

v.

M & M/MARS, Defendant–Appellant.

No. 88–1871.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1988.

Decided July 6, 1989.

As Amended Aug. 18, 1989.

L. Steven Platt, Arnold & Kadjan, Charles A. Linn, Chicago, Ill., for plaintiff-appellee.

David A. York, Latham & Watkins, Michael T. Hannafan, Hannafan & Handler, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

M & M/Mars (Mars) fired Edward Brown on July 1, 1983. Brown was 47 years old. Brown sued Mars, alleging that Mars had fired him because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634. A jury found that Mars had discriminated against Brown because of his age. The jury also found that Mars' discrimination was willful and therefore doubled Brown's damages. The district court denied Mars' motion for judgment notwithstanding the verdict. Mars appeals, contending that the evidence was insufficient to show age discrimination, that the district court improperly instructed the jury on willfulness, and that Brown's damages must be reduced. We affirm the

jury's finding of age discrimination but we remand for a new trial on willfulness and we reduce Brown's damage award.

### I.

In an age discrimination case, a plaintiff must prove that age was a determining factor in, or, in other words, a "but for" cause of an adverse employment decision. See, e.g., *Maguire v. Marquette University*, 814 F.2d 1213, 1216 (7th Cir. 1987); *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 89 (7th Cir.1986).[1] A plaintiff may attempt to prove discrimination by introducing direct evidence that age was a determining factor or by employing the shifting burdens framework the Supreme Court first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Kier v. Commercial Union Ins. Co.*, 808 F.2d 1254, 1257 (7th Cir.1987). But at this stage of the case, after a full trial on the merits, we need not concern ourselves about the method of proof Brown used. The only question for us to answer is whether there was sufficient evidence for a reasonable jury to find that age was a determining factor in Mars' decision to fire Brown. *Id.;* cf. *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14, 103 S.Ct. 1478, 1480–81, 75 L.Ed.2d 403 (1983). In making that determination, we must view the evidence and all reasonable inferences from it in the light most favorable to Brown. See *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir. 1985).

After having worked in Mars' Chicago candy plant since 1961, Brown became "shift manager" of B shift, the plant's afternoon shift, in July 1978. About an hour after B shift started on June 14, 1983,

workers had to shut down line 9 (one of the plant's production lines) when a relief operator inadvertently flooded the line's caramel cookers after failing to notice that a water valve was incorrectly positioned. The workers on line 9 made several attempts to restart the line during B shift but were unable to do so before the shift ended. Workers on C shift (the plant's "graveyard" shift) were finally able to restart the line about one and one-half hours after their shift started.

Richard Vincent, the Chicago plant's production manager and Brown's direct supervisor, found out about the "down-time incident" the next day. By Friday, June 17, Vincent had decided to remove Brown from his position as B shift manager. On July 1, 1983, Vincent, after investigating the incident and consulting with Vera Blanchet, the plant's Personnel Director, fired Brown.

Mars contends that it fired Brown because of a series of problems with Brown's performance as B shift manager that culminated in the June down-time incident, and that no reasonable jury could believe otherwise. The record does contain evidence from which the jury could have found Brown's performance led to his firing. Vincent testified that Brown consistently, and at times antagonistically, resisted the changes in operating procedures that Vincent attempted to implement to make the Chicago plant more efficient and profitable. Vincent also testified that Brown did not work well with other shift managers, that Brown did not properly train and delegate responsibility to subordinates, and that Brown lacked flexibility in solving problems. During the time Vincent was Brown's direct supervisor—August 1980 until Brown's firing—Vincent's writ-

---

1. In *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a majority of the Supreme Court held that in some employment discrimination cases, the defendant bears the burden of showing that it would have made the same employment decision even absent any discrimination. See *id.* 109 S.Ct. at 1784–92 (plurality opinion); *id.* at 1795–96 (White, J., concurring); *id.* at 1796–1806 (O'Connor, J., concurring); see also *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1329–1330 (7th Cir.1989). We need not examine the differences in approach between the plurality and concurring opinions, nor need we examine whether any shift in the burden of proof is appropriate in this case. In this case, the district court instructed the jury that Brown bore the ultimate burden of showing that age discrimination was a determining factor in his firing; as we shall see, Brown presented sufficient evidence to meet this burden.

ten evaluations of Brown touched on these problems.

According to Vincent, the down-time incident led to Brown's firing because it directly resulted from Brown's deficiencies as a manager. Vincent described the incident as a "comedy of errors" caused by "people problems." According to Vincent, properly trained employees should have been able to restart line 9 well before B shift ended. Vincent said he was especially displeased with the performance of Matt Armstrong, the Mars employee who directly supervised line 9 on the B shift. In fact, Vincent had earlier stated to Brown that Armstrong was incapable of running line 9 and had suggested that Brown either transfer, demote, or fire Armstrong.

Mars witnesses also stated that if Brown's subordinates could not solve the problem on line 9, then Brown himself should have become more actively involved. On the night of the down-time incident, Brown was working on a project involving another production line and only briefly visited line 9 once after learning about the problem on the line. Bill Benzinger, the A shift manager, testified that when he asked Brown why he had not become more involved, Brown replied, "Well, Dick [Vincent] wanted me to give my supervisors more responsibility, and so I did." According to Mars, this statement demonstrates Brown's recalcitrant and antagonistic attitude toward Vincent and the changes Vincent was trying to implement.

Based on this evidence, Mars argues that the jury had no choice but to reject Brown's claim. But Mars argues as if the jury was required to believe its version of events. The jury was not; and the record discloses ample evidence from which the jury could have found that Mars' asserted reasons for firing Brown were pretextual.

Brown introduced evidence from which the jury could believe that he was a loyal, conscientious worker and an effective manager. Brown's shift consistently produced more candy and controlled scrap and product quality better than the other two shifts. The jury also could have concluded that Brown's shift was more profitable than the other two shifts.

Mars protests that the evidence of Brown's productivity is not probative of pretext because it does not directly address the specific reasons for which Mars claims it fired Brown: his resistance to change, his inflexibility in problem-solving, his failure to train and delegate responsibility to subordinates, and his antagonistic attitude. To a certain extent this is true. A company has a right to expect not only that its employees be productive but that they be productive in the company's way. But a relationship between a plant's or an individual shift's productivity and its supervisor's managerial skills normally exists. The jury could reasonably infer that B shift could not have been as productive as it was if Brown really was inflexible and negative, or poorly trained his subordinates. Poorly trained and motivated workers do not normally outperform their better-trained and motivated counterparts. Thus, Brown's positive performance could, in a reasonable juror's mind, undercut Mars' asserted reasons for firing Brown and suggest pretext.

In any event, there was also evidence that directly addressed and countered Brown's purported inflexibility, resistance to change, and failure to train and delegate responsibility to subordinates. Witnesses, including Mars' own, testified that Brown was as or more effective than other shift managers in coordinating his shift with other shifts and in getting his own shift to work together as a team. Without getting into unnecessary detail, there was also testimony that Brown made positive contributions to plant productivity and morale, effectively trained his subordinates, delegated responsibility (including the responsibility for preparing hourly employee performance evaluations, allegedly a particular sore spot for Vincent) to subordinates, and accepted and sometimes even initiated changes in operating procedures to improve performance. In short, there was ample evidence from which the jury could conclude that Brown was effective in the areas in which Mars asserted he was not.

The jury also could have reasonably found that the down-time incident was not the result of "people problems" and Brown's incompetent management. Brown testified that restarting the line after the caramel cookers were flooded would normally take about three hours. Other unforeseeable problems arose, however. As workers restarted the line, an electrical problem caused the caramel cooling wheel to stop turning, and in turn caused caramel to freeze on the wheel. This forced the workers to shut the line down again so they could remove the caramel from the wheel. After cleaning the wheel, the workers again attempted to restart the line but were again thwarted. By that time, B shift was almost over, and there was insufficient time to find and fix the new problem before C shift began. C shift workers eventually discovered the problem—a hard chunk of caramel caught under the line's caramel pump—and restarted the line. The jury reasonably could have believed that the down-time incident was not caused by "people problems" but by unforeseen circumstances beyond Brown's or anybody else's control.

■ Mars correctly asserts that evidence that Brown was performing well does not necessarily prove that its asserted reasons for firing him were pretextual. Vincent may have been mistaken about Brown's performance but an employer that is mistaken about its reasons for firing an employee but honestly believes those reasons does not violate the ADEA. *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 429 (7th Cir.1980); see also *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559–60 (7th Cir.1987) (Title VII). According to Mars, the jury was not entitled to find that Vincent did not sincerely believe that Brown's performance was deficient in the areas Vincent deemed important.

We disagree. For one thing, the jury could have concluded that Vincent and his superiors considered production, product quality, and ultimately profit to be the most important indicators of managerial performance. Vincent testified that production and profitability were important in evaluating a shift manager's performance. Moreover, Vincent regularly held meetings with his three shift managers. Guy Klinzing and Bill Benzinger, the C and A shift managers, testified that these meetings generally focused on productivity, scrap levels, product quality, and absenteeism control. The jury could reasonably conclude that the subjects that Vincent harped on when he met with his managers were the subjects that made the most difference to him, and therefore that the reasons he gave for firing Brown were not the true reasons.

Moreover, it was reasonable for the jury to infer that if fellow employees who worked with Brown testified that Brown performed well in the areas in which Vincent testified Brown was deficient, then Vincent could not have sincerely believed that Brown was not performing well. Cf. *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 17–19, 21–22 (7th Cir.1987) (testimony from others about plaintiff's good performance is relevant in determining whether the decision-maker's reliance on poor performance is pretext). This is not a case where the jury specifically found that Vincent did believe Brown's performance was deficient, cf. *Pollard*, 824 F.2d at 559, or where the only evidence regarding Brown's performance was his own self-serving testimony, cf. *Weihaupt, supra*, 874 F.2d at 429–430. The fact that some of this testimony about Brown's good performance came from Mars' managerial employees makes it all the more significant. For example, Herb Sarney, a Mars managerial employee who sat at Mars' counsel's table during the trial, testified that Brown was a very good shift manager who trained and delegated responsibility to subordinates, worked effectively with other shifts, and was effective in getting his own shift to work as a team.[2]

---

**2.** Sarney also testified that Vincent had an "autocratic" management philosophy that involved "dictating" to subordinates. While such an "autocratic" management style does not itself violate the ADEA, Sarney's testimony does tend to undermine Vincent's professed concern with delegating responsibility to subordinates; the jury could have found that if Vincent really

The inference that Vincent did not sincerely believe the reasons he gave for firing Brown is also supported by a draft evaluation of Brown that Vincent prepared in May 1983. That evaluation noted that Brown "responds well to given assignments," and rates Brown's performance as "B+" or better in the following areas: "recognition of different perspectives" (A−); "understanding processing technology" (A); "knowledge of good manufacturing practices" (A); "competence, focus on excellence" (A−); "systematic thinking" (A−); "concern with subordinates' performance" (B+); "delegating and monitoring" (B+). These high marks are consistent with the other witnesses' evaluation of Brown's performance. The jury could reasonably infer that Vincent could not give Brown high marks in the areas mentioned and yet sincerely believe that Brown was the inflexible, recalcitrant manager Vincent testified he was.

Finally, the jury could conclude that Vincent did not fire Brown because of the down-time incident. Since Vincent investigated the incident, it is reasonable to conclude that Vincent learned the facts surrounding the incident, including Brown's version of the incident. If the jury believed Brown's version, it could infer that Vincent knew that version and also believed it. Thus, the jury could have found that Vincent believed that circumstances beyond Brown's control, not "people problems," improper training, or managerial incompetence, caused the down-time. This inference is buttressed by Vincent's testimony about his displeasure with Armstrong. Although Vincent said he thought Armstrong did a poor job and was not competent to run line 9, there is no evidence that Mars ever disciplined Armstrong because of the down-time incident; in fact, at the time of trial, Armstrong still worked for Mars. There was also evidence that similar down-time incidents occurred at the plant and that Mars had never fired anybody because of down-time.

■ Eliminating Brown's performance and the down-time incident as reasons for firing Brown leaves the "antagonistic" relationship between Brown and Vincent as a reason for firing Brown. Firing Brown because of his inability to get along with Vincent would not violate the ADEA. Cf. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1414–15 (7th Cir.1984). But again, the jury did not have to believe that this was the real reason Mars fired Brown. Brown testified that he was not antagonistic or disrespectful towards Vincent; the jury could credit this testimony. Moreover, given that there was reason to doubt Vincent's other asserted reasons for firing Brown, the jury was entitled to look askance at the theory that Vincent fired Brown because of his "antagonism."

Mars notes that shortly after his firing, Brown indicated that Vincent fired him because the two "never did get along," and because Vincent had a "personal vendetta" against him. But while these were potentially damning admissions by Brown, they did not compel a finding of no discrimination as a matter of law. A plaintiff's statement about what he *believes* is the reason for his firing does not necessarily prove that that belief is correct. In fact, the document that contained the "personal vendetta" statement (a letter that Brown wrote shortly after his firing to Forrest Mars, Jr., Mars' President) also referred to age discrimination as a possible reason for Brown's firing. The jurors could evaluate Brown's statements in light of all the evidence and give those statements the weight they felt appropriate.

■ There was sufficient evidence for the jury to conclude that the reasons Mars gave for firing Brown were pretextual. But as we noted in *Pollard*, "[s]howing that the employer dissembled is not necessarily the same as showing 'pretext for *discrimination* …' "; the employer may be trying to hide some other reason besides discrimination for firing the plaintiff. 824

---

believed that delegating responsibility was important to good management, it is likely he

would have practiced what he preached.

F.2d at 559 (emphasis in original). Unlike in *Pollard,* however, there is enough evidence in this case to supply the necessary inference of discrimination. At the time Mars fired Brown, he was the oldest shift manager at the Chicago plant. Klinzing and Benzinger, the other two shift managers, were both in their early thirties. The jury could have found that Brown outperformed both Klinzing and Benzinger, even in areas in which Vincent asserted that Brown was deficient; Sarney, for example, testified that Brown was more effective than Benzinger in coordinating his shift and in working with the other shifts. There was also testimony that Brown was the only shift manager who moved his line supervisors to different lines, something all three shift managers were supposed to do. (See Tr. 795) While the evidence is not entirely clear, it is a fair inference that Klinzing and Benzinger were the other two shift managers at the time this occurred. (See Tr. 795 (Armstrong); Tr. 1253 (Sarney).) Also, as we have noted, there was evidence that down-time incidents similar to the one that ostensibly led to Brown's firing occurred on the other shifts. Yet, Mars did not fire younger shift managers—Klinzing and Benzinger—as a result of down-time, even though Brown's performance and "up-time" (the converse of "down-time") statistics were superior.

In short, the jury could have reasonably found that Mars treated Brown, the oldest shift manager, less favorably than it treated younger shift managers. This is enough to raise an inference of age discrimination. See, e.g., *Webb v. City of Chester,* 813 F.2d 824, 831–32 (7th Cir. 1987); cf. *Pollard,* 824 F.2d at 560 (noting, in reversing a district court's finding of race discrimination, that "the district court did not conclude that any white employee had been treated better"). That Mars gave false reasons for firing Brown strengthens this inference. See *id.* at 559; *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 899 (3d Cir.1987) (en banc).[3]

This was a close case; as Mars' counsel stated at trial, credibility was a key issue. Such cases are for juries; appellate panels have no opportunity to observe witness de-

---

**3.** Brown attempted to buttress his case by showing that Mars had systematically attempted to reduce the age of its work force by discriminating against older employees. We find this attempt weak, at best. Brown introduced statistics that essentially showed that the number of employees aged 50 to 60 decreased over the years and in some years was lower than one would expect, and that the deviation from the expected number was statistically significant (i.e., not due to chance). These statistics show little, if anything, about age discrimination. For one thing, the statistics also showed that the number of employees aged 20 to 30 decreased over the years and was significantly lower than expected during some years and that the number of employees aged 40 to 50 (Brown's own age group at the time he was fired) actually increased over the years. More important, Brown's statistical expert did not distinguish between employees whom Mars fired and those who left Mars for some other reason (for example, death or voluntary retirement). The statistics thus do not show that Mars *fired* older employees at a statistically more significant rate than younger employees. Brown's statistics showed little more than that the work force became younger over time. As we have previously noted, "this 'phenomenon' represents the normal course of employment histories, and is nothing to marvel at. When older employees leave work, for whatever reasons, they will of-

ten be replaced by younger employees." *Kier v. Commercial Union Ins. Co.,* 808 F.2d 1254, 1258 (7th Cir.1987).

Brown also attempted to raise an inference of discrimination by showing that Mars had offered a series of voluntary separation plans (VSP's) that he claims were geared toward persuading older workers to leave Mars. However, Mars offered these VSP's to all eligible employees regardless of age. Brown intimates that the plans were more attractive to older workers, but it is not age discrimination to offer a voluntary separation plan that is more attractive to older workers than younger workers, even if done to induce older workers to leave, unless the plan is not truly voluntary. *Henn v. National Geographic Society,* 819 F.2d 824 (7th Cir.1987). Despite Brown's attempt to show instances where the decision to accept a VSP was not voluntary, we find no evidence in the record from which a reasonable jury could so conclude.

Brown's statistical and anecdotal evidence perhaps shows that Mars was conscious of age and was willing to reduce the Chicago plant's work force's average age by legal means (such as the VSP's). Whether this is sufficient to support an inference of *illegal* age discrimination is something we need not decide because we have found the evidence sufficient to support the jury's verdict without the statistics and anecdotal evidence.

meanor, and second-guessing credibility determinations will rarely, if ever, lead to a more "just" result. The jury was entitled to credit Brown's accounts of events and disbelieve Mars' account. There was sufficient evidence to uphold the jury's verdict.

## II.

■ Besides finding that Mars fired Brown because of his age, the jury also found that Mars' discrimination was willful and awarded liquidated (double) damages. The district court instructed the jury that

> [t]o prove willful age discrimination plaintiff must show ... that M & M/Mars' discriminatory actions were knowingly and voluntarily taken and not unintentional and that M & M/Mars knew or *reasonably should have known* that it was violating the Age Discrimination in Employment Act when it took those actions.

(Emphasis added.) The "reasonably should have known" standard was error. Discrimination under the ADEA is willful only if, when the defendant acted, the defendant " 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " The "reasonably should have known" standard, which is essentially a negligence standard, is inconsistent with the "reckless disregard" standard. *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 835–36 (7th Cir.1988) (*Coston II*); see also *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 1681–82 and 1682 n. 13, 100 L.Ed.2d 115 (1988).

■ Brown concedes that the "reasonably should have known" instruction was erroneous. But Brown contends that Mars has waived its opportunity to contest the instruction because Mars did not object to it; in fact, Mars proposed the instruction. The circumstances of this case, however, lead us to conclude that Mars has not waived its challenge to the instruction.

The "reasonably should have known" standard came from this court's decision in *Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 155–56 (7th Cir.1981). In 1985, the Supreme Court upheld the Second Circuit's holding that an ADEA violation is "willful" if "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Although at first blush it might seem that *Thurston*'s "reckless disregard" standard is inconsistent with *Syvock*'s "reasonably should have known" standard, see *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321, 1338 (7th Cir. 1987) (*Coston I*) (concurring opinion), there was language in *Thurston* that left room for disagreement. See *Richland Shoe*, 108 S.Ct. at 1682 n. 13. This court relied on that language to hold in a series of cases that *Syvock*'s standard was consistent with *Thurston*'s. See *id.* at 1327; *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 23 (7th Cir.1987); *Rengers v. WCLR Radio Station*, 825 F.2d 160, 165–66 (7th Cir.1987) (*Rengers I*).

The defendants in *Coston I* and *Rengers I* filed petitions for certiorari. While those petitions were pending, the Court decided *Richland Shoe*. In *Richland Shoe*, the Court made clear that reckless disregard, not reasonableness, is the proper standard for willfulness under both the ADEA and the Fair Labor Standards Act (from which the ADEA's willfulness provision came) and that the two standards are incompatible. See 108 S.Ct. at 1681–82 & 1682 n. 13. In light of its decision in *Richland Shoe*, the Court vacated our decisions in *Coston I* and *Rengers I* and remanded those cases to this court; subsequently, we remanded *Rengers I* and *Coston I* for new trials on willfulness, and in *Coston II* we explicitly overruled *Syvock*'s reasonableness standard. *Rengers v. WCLR Radio Station*, 857 F.2d 363 (7th Cir.1988) (*Rengers II*); *Coston II*, 860 F.2d at 834–37.

This case was tried in October 1987, after our decisions in *Rengers I*, *Graefenhain*, and *Coston I* but before *Richland Shoe*, *Rengers II*, and *Coston II*. Normally, a party may not challenge an instruction on appeal that the party did not object to at trial. See Fed.R.Civ.P. 51. But an exception to this rule exists where an intervening Supreme Court case changes the law

while appeal is pending. *General Beverage Sales Co. v. East–Side Winery,* 568 F.2d 1147, 1152–53 (7th Cir.1978); see also *Rengers I,* 825 F.2d at 165. This rule is a corollary to the general rule that an appellate court should apply the law as it exists at the time of appeal. See *General Beverage Sales,* 568 F.2d at 1152.

Brown points out that when the case was tried, the Supreme Court had already decided *Thurston;* therefore, Mars could have submitted a *Thurston* instruction instead of the *Syvock* instruction that it did submit. But by the time of trial in this case, this court had already decided *Rengers I, Graefenhain,* and *Coston I.* Those cases firmly established as the law of this circuit that *Syvock*'s standard was consistent with *Thurston.* Mars' instruction precisely tracked the standard those cases declared. Given the clear law in this circuit at the time of trial, it would have been pointless to submit a different instruction. Only after *Richland Shoe, Rengers II* and *Coston II* did it become clear that the *Syvock* instruction was error. Given the circumstances in this case, Mars did not waive its right to contest the willfulness instruction.

█ On the merits, Mars insists that in individual treatment cases such as this one, a plaintiff must prove an extra element— some "outrageous" conduct by the employer—to establish a willful ADEA violation. In *Thurston,* the Court stated that Congress intended that liability under the ADEA be "two-tiered": after finding that an employer violated the ADEA, the jury must go on to determine whether that violation is willful. It follows that under this two-tiered liability scheme not every ADEA violation will be—or should be—willful. See *Thurston,* 469 U.S. at 125–28, 105 S.Ct. at 623–25. The problem, according to Mars, is that in individual treatment cases, a finding that an employer violated the ADEA presupposes a finding that age, at least in part, motivated the employer. Since few, if any, employees are unaware that the ADEA prohibits age discrimination, Mars argues that the *Thurston* standard will lead to a finding of willfulness against all employers found to violate the

ADEA in individual treatment cases. Hence, something more—according to Mars, "outrageous conduct"—is required. The Third Circuit, following essentially this reasoning and analogizing to the requirement in section 908 of the *Restatement (Second) of Torts* that outrageous conduct is necessary to impose punitive damages (an analogy the court found suggested by *Thurston's* recognition that ADEA liquidated damages are "punitive in nature," see 469 U.S. at 125, 105 S.Ct. at 624) has held that in an individual treatment case "outrageous" conduct is necessary before liquidated damages are appropriate. See *Dreyer v. Arco Chemical Co.,* 801 F.2d 651, 656–58 (3d Cir.1986).

We respectfully disagree with our colleagues in the Third Circuit. The ADEA does not mention outrageousness, and such a requirement does not flow naturally from the ADEA's adoption of willfulness as the necessary predicate to liquidated damages. *Thurston* nowhere speaks of any requirement that an employer act outrageously before liquidated damages are appropriate; in fact, *Thurston* specifically rejected an interpretation of "willfulness" that would require "evil motive or bad purpose," 469 U.S. at 126 n. 19, 105 S.Ct. at 624 n. 19, a part of the Restatement definition of "outrageousness" that the Third Circuit relied upon in formulating its standard. See *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1550 (10th Cir.1988) (rejecting the "outrageous conduct" requirement for willfulness).

Moreover, it is not necessarily true that the *Thurston* standard, unadorned by any "outrageousness" requirement, will lead to an automatic willfulness finding every time a jury finds an ADEA violation in an individual treatment case. For example, an employer may have a valid legal question about whether age is a bona fide occupational qualification. See 29 U.S.C. § 623(f)(1). An employer that is incorrect but not reckless in determining that age is a b.f.o.q. does not act willfully. Cf. *Thurston,* 469 U.S. at 128–30, 105 S.Ct. at 625–26; *Richland Shoe,* 108 S.Ct. at 1682 n. 13. Furthermore, the requirement to trigger liability that age be a determining factor

"does not in itself require a finding as to defendant's state of mind" because the law distinguishes between motive and intent. *Burlew v. Eaton Corp.*, 869 F.2d 1063, 1066 (7th Cir.1989). As we have noted many times, age discrimination may be "subtle and even unconscious," and "an ADEA plaintiff can establish ... liability without presenting any evidence as to the employer's state of mind" by using the *McDonnell–Douglas* burden-shifting method of proof. See *id.* at 1066 and the cases it cites. A plaintiff who proves only this subtle and unconscious discrimination has not shown willful discrimination.

■■■ *Burlew* does point out that despite this circuit's adherence to the proposition that age discrimination can be unconsciously motivated, our cases have concluded that to find age was a determining factor in an employer's decision means that the employer *intentionally* discriminated. *Id.* Even so, this does not necessarily lead to the conclusion that a finding of ADEA liability in an individual treatment case inevitably leads to a finding of willfulness. It is possible that the relevant decisionmaker might not know about the ADEA's prohibitions. More likely is a situation in which a low-level supervisor intends to discriminate but withholds any facts that might lead the relevant decisionmaker, higher up in the chain of command, to suspect discrimination. In either of these two cases, a jury could reasonably conclude, depending on all the circumstances present, that the employer's action was not willful. Even if the unadorned *Thurston* standard will lead to a willfulness finding in almost all successful individual treatment cases, "[p]erhaps that is as it should be, given the nature of a disparate treatment case." See *id.* at 1067. At the very least, we think that where an employer consciously and deliberately does what it knows or must know the ADEA prohibits, that employer has acted willfully.

While both Brown and Mars recognize that the willfulness instruction was erroneous, both argue that we need not remand this case to the district court. Brown argues that the evidence of willfulness, even under the reckless disregard standard, was so overwhelming that the error in instruction was harmless. Mars, as one might expect, argues that the evidence of willfulness is so paltry that no reasonable jury could find willfulness, even if outrageousness is not a necessary element of willfulness.

■■■ After reviewing the record we conclude that, as is typical, the truth lies somewhere between these two extremes. In this case, the evidence sharply conflicts about who the relevant decision-makers are (Brown says Vincent and Personnel Director Blanchet, among others; Mars insists only Vincent) and their knowledge about the ADEA or the totality of circumstances surrounding Brown's firing. The willfulness issue could go either way, so we must remand for a new trial on willfulness under the proper standard.

### III.

■■■ Mars finally argues that we must reduce Brown's damages by the amount of lost pension benefits the jury awarded him and that the jury may not include the amount of lost pension benefits in calculating liquidated damages. The jury awarded Brown damages for lost pension benefits based on calculations by Brown's expert. Brown's expert calculated the present value of Brown's expected pension payments assuming that he worked until May 15, 1987 (the original trial date) and the present value of Brown's expected pension payments, assuming that he worked until June 30, 1983 (the actual last day of Brown's employment). The expert testified that the difference between those two amounts represented the amount of pension benefits that Brown lost because of Mars' discrimination; that amount is the amount the jury awarded Brown as lost pension benefits.

Brown filed a motion for equitable relief, including reinstatement. The district court ordered Mars to reinstate Brown. Mars represented below and in this court that upon reinstating Brown, it would reinstate Brown to the company pension plan as if he had continued working. We hold Mars to its word. Thus, when Brown retires he

will be entitled to the same pension benefits he would have received if Mars had never fired him. In other words, he has not lost any pension benefits.

Despite this, Brown asserts that he may still keep the lost pension benefits award. We find this contention puzzling—and somewhat disingenuous—given that in the district court Brown conceded that if the district court reinstated him he would have to give up the lost pension benefits award. See *Brown v. M & M/Mars*, No. 84–C–7554, Order at 6 (N.D.Ill. April 5, 1988); see also Plaintiff's Reply Brief in Support of Motion for Equitable Relief at 7. (We also find it puzzling that Mars did not see fit to mention this concession in its brief.) Given Brown's concession below and Mars' representation that it is giving Brown full pension credit for the time between his firing and reinstatement, we hold that Brown may not keep the lost pension benefits award.

 Brown argues that even if he may not keep the amount awarded him for lost pension benefits, the jury may still double this amount in calculating liquidated damages. We think not. Under the ADEA, the amount of liquidated damages for a willful violation is the amount " 'equal to the pecuniary loss.' " *Coston I*, 831 F.2d at 1330 (quoting H.R.Rep. No. 950, 95th Cong. 2d Sess. 13, *reprinted in* 1978 U.S. Code Cong. & Admin.News 504, 535). "Thus, the amount of actual harm done the plaintiff must be determined prior to doubling the damage award as required to establish liquidated damages." *Id.* Because of the district court's reinstatement order, Brown has not lost any pension benefits; when he retires, he will receive the same pension he would have received if Mars had never fired him. Since no liquidated damages can result if no harm has been done, the amount awarded to Brown for lost pension benefits may not be doubled as part of any liquidated damages award.

### IV.

We AFFIRM the jury's finding of age discrimination. We REMAND for a new trial on willfulness. Brown may not receive the amount the jury awarded for lost pension benefits, and that amount may not be included in any calculation of liquidated damages if Mars is found to have acted willfully. Each party shall bear its own costs on appeal. Rule 36 shall not apply.