948 F.2d 1292
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
James L. TREADWELL, Jr. and Deborah Treadwell, Plaintiffs-Appellants,
v.
Charlene KENNEDY and The George Developers, Defendants-Appellees.
 No. 88-2958.
 United States Court of Appeals, Seventh Circuit.
 Argued June 14, 1991.
Decided Dec. 2, 1991.
 
 Before POSNER, MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 James and Deborah Treadwell sued the George Developers and its agent, Charlene Kennedy, alleging that George and Kennedy violated 42 U.S.C. § 1982 by refusing to rent an apartment to them because James was black. After entering judgment on a jury verdict for the Treadwells, the court granted the defendants' motion for a new trial based on newly-discovered evidence. The Treadwells appeal this decision and we affirm.
 
 I.
 
 2
 This case arose from James' and Deborah's attempt to rent an apartment in a 14-unit complex known as the Kennedy Apartments in Springfield, Illinois. The complex was owned by George Developers and managed by Kennedy. In March 1984, Deborah (who at the time was named Deborah Johnson) and James were engaged to be married and were living at James' father's and stepmother's home. At the time, Deborah had recently graduated from high school while James was in his senior year of high school. James and Deborah had decided that it was time for them to move out of James' father's home to see if they could make it on their own. Deborah began to search for apartments and in late March found an apartment in the Kennedy Apartments.
 
 
 3
 At trial, James and Deborah tried to show that the defendants were willing to rent the apartment to them until they found that James was black. Deborah testified that she was shown an apartment by Doug Williams, Kennedy's son, who lived at the complex and performed maintenance work there. According to Deborah, Williams gave her a lease to take home and fill out. Deborah met again with Williams the next day. She told Williams she wanted to rent the apartment and gave him the lease which she had filled out and signed. She also gave Williams $255.00 as partial payment of the first month's rent (which was $290.00) and $290.00 security deposit. Deborah testified that Williams (after consulting on the phone with Kennedy) gave her permission to move some belongings into the apartment.
 
 
 4
 Two days later, Deborah, James, and Brian Schroeder, a white friend, went to the apartment to move some boxes in. As they were leaving they met Williams. Williams went up to Schroeder and asked if he was "Mr. Treadwell" (since Deborah had introduced herself to Williams as Deborah Treadwell, and told him she and James were married). Both Deborah and Schroeder replied that James, not Schroeder, was Mr. Treadwell. Deborah, James, and Schroeder all testified that Williams gave James a "weird" or "funny" look upon finding that James, the black man, was Deborah's (purported) husband.
 
 
 5
 The following afternoon, Kennedy called Deborah at the Treadwell residence. Kennedy told Deborah that she could not have the apartment because it already had been rented to two other people. Kennedy also told Deborah that no other apartments were available. Both these statements were false. Kennedy did rent the apartment to other people but not until after she had turned down James and Deborah. And James' stepmother called Kennedy under an assumed name and was told apartments were available at the complex.
 
 
 6
 James and Deborah filed a discrimination complaint with the Springfield Fair Housing Board. Barbara Braidwood, a "human rights specialist" employed by the Board, investigated the complaint. As part of the investigation, Braidwood sent two testers (one white and one black) to the apartments. The white tester, Debby Tobin, testified that during a follow-up phone call she made to Kennedy after visiting the apartments, Kennedy asked Tobin if she had a black boyfriend. Kennedy admitted asking this question. Tobin also testified that Kennedy told her she did not want any mixed couples at the apartment because of a prior bad experience with a mixed couple.
 
 
 7
 Braidwood and Kennedy met several times during Braidwood's investigation. According to Braidwood, the only explanation Kennedy offered at any of these meetings was the same explanation she offered Deborah--that she had rented the apartment to somebody else. Kennedy explained to Braidwood that she was out of town when Williams showed the apartment to Deborah and that Williams was unaware that Kennedy had previously rented the apartment. When Kennedy found out about Deborah's interest, she told Deborah that the apartment already had been rented. Kennedy submitted several documents--including a lease for the apartment that she had backdated to a date before Deborah had looked at the apartment, and written statements from herself and Williams--to support her story to Braidwood.
 
 
 8
 The defendants denied race had anything to do with their refusal to rent to the Treadwells. In fact, Kennedy testified that at the time she rejected the Treadwells she did not know James (whom she had never met) was black and Williams testified he never told Kennedy that James was black.
 
 
 9
 According to Williams, when Deborah first met him she told him that she worked at a day-care center. She also told him that James was a college student who received a grant that could be used for rent and that James worked as a cook at a restaurant. Both Williams and Kennedy testified that although they tried, neither could verify Deborah's employment. Kennedy also testified that she could not verify that James was a college student (which is not surprising since he was a high school senior) and that she was told by people at the restaurant at which he worked that James was a dishwasher, not a cook. Kennedy said she obtained an oral credit report regarding James (a report that turned out to be on James' father) and that the report was poor. Moreover, according to both Williams and Kennedy, Deborah never completed the rental application form that Williams said he gave her at their first meeting.
 
 
 10
 Kennedy explained that the lack of a completed application, the poor credit rating, and her inability to verify the information Deborah gave raised serious questions about James' and Deborah's ability to pay rent when due. Under those circumstances, she could not rent them the apartment. Kennedy stated that she told Deborah the story about previously renting the apartment to others because she thought the truth would hurt Deborah's and James' feelings. She also testified that she tried to explain to Braidwood her real reasons for rejecting the Treadwells but that Braidwood was not interested. Braidwood's disinterest along with a general fear of the investigation process and her receipt of several harassing phone calls led her to tell Braidwood the false story about the previous renters.
 
 
 11
 Kennedy admitted asking Tobin about whether she had a black boyfriend. However, she explained that when she said this it was late at night and she was tired. Kennedy denied telling Tobin that she had had past problems with interracial couples. Indeed, Tobin's tester's report form made no mention of that comment.
 
 
 12
 A number of blacks had resided at the Kennedy Apartments through the years, including a black man who lived with a white woman. Before March 1984, no complaints of racial discrimination had been made against the apartments' owners or managers. While Kennedy had been managing the apartments (a period of about three months), she accepted two black renters. Both testified on Kennedy's behalf. Ken Owens and his wife rented an apartment from Kennedy from February 1984 until October 1985. Owens described Kennedy as "[v]ery friendly, very outgoing ... very warm, very sincere to us." He also testified that Williams was a "nice person" with whom he got along well. Rebecca Franklin, the other black Kennedy accepted as a tenant, testified that Kennedy was "very nice" to her and her seven-year-old son and had offered to let the son earn money by performing odd jobs. After Franklin signed a lease, however, she decided for personal reasons not to move in. Franklin stated that Kennedy was understanding and gladly returned the money Franklin had paid for her first month's rent.
 
 
 13
 Williams' version of his first meeting with James differed markedly from the plaintiffs' version. Williams testified that when he found out James, not Schroeder, was Mr. Treadwell (his first knowledge James was black) he shook James' hand and asked him if he liked the apartment. Williams also testified that at that time he asked again for an application and the rest of the first month's rent and security deposit due. Deborah had neither. Williams did not consider the apartment rented, and was "shocked" to find James' and Deborah's belongings in the apartment (which he entered after James, Deborah, and Schroeder left) because they had not yet been accepted as tenants.
 
 
 14
 Despite Kennedy's protestations of innocence, the jury found that she (and through her, the George Developers) had refused to rent to the Treadwells because James was black. A hearing on damages was set to begin the next day. On that day, a Springfield newspaper contained a story about the liability verdict. Three members of Deborah's family read the story. They contacted the defendants' lawyer and told him they had information that could be relevant to the case. The defendants' attorney asked the district court to reopen the liability phase of the trial so the jury could consider Deborah's family members' testimony but the court refused, fearing that reopening the testimony would unduly emphasize the new evidence. The court did, however, allow the family members to testify at the damages hearing.
 
 
 15
 Julie Johnson, Deborah's sister-in-law, testified that Deborah had told her that when talking with Williams she introduced herself as Deborah Treadwell and that she had introduced a friend as her sister. Johnson also stated that Deborah had said she had not been discriminated against, that James' father was pushing the case, and that she wanted no part of the case. According to Johnson, Deborah had twice said she thought the case had been dropped. Ray Johnson and David Johnson, Deborah's father and brother, both testified that Deborah had told them she thought the case had been dropped. They also testified that Deborah had admitted to them the same falsehoods to Williams that she had admitted to Julie Johnson.
 
 
 16
 During closing arguments on damages, James and Deborah's attorney asked the jury to award James $20,000 to $40,000 and Deborah $10,000 to $20,000. Kennedy's attorney asked the jury to award only nominal damages. The jury did neither. Instead, it awarded James $400.00 and Deborah $200.00. The district court entered judgment on the jury's verdict.
 
 
 17
 Kennedy filed a timely motion for new trial. In that motion, Kennedy argued that the newly-discovered evidence provided by the Johnson family members cast doubt on the jury's liability verdict and justified a new trial. The district court agreed and granted the motion. After James and Deborah refused to go forward with the new trial, the district court dismissed the case with prejudice for failure to prosecute. See Fed.R.Civ.P. 41(b). The Treadwells appeal from that judgment.
 
 II.
 
 18
 Federal Rule of Civil Procedure 59(a) provides that a district court may grant a new trial after a jury trial "for any of the reasons for which new trials have heretofore been granted in actions at law in courts of the United States." One of those reasons is a party's discovery of new evidence that it could not present at trial. Generally, for newly-discovered evidence to warrant a new trial, the following prerequisites must be met:
 
 
 19
 1) the evidence existed at the time of trial or pertains to facts that existed at the time of trial:
 
 
 20
 2) the evidence was discovered following trial;
 
 
 21
 3) the party presenting the new evidence exercised due diligence in discovering the evidence:
 
 
 22
 4) the evidence is admissible;
 
 
 23
 5) the evidence is credible;
 
 
 24
 6) the evidence is material;
 
 
 25
 7) the evidence is not merely cumulative or impeaching; and
 
 
 26
 8) the new evidence is likely to change the outcome.
 
 
 27
 Mumford v. Bowen, 814 F.2d 328, 330 (7th Cir.1986); see also Peacock v. Board of School Commissioners of Indianapolis, 721 F.2d 210, 213-14 (7th Cir.1983). Whether new evidence is sufficient to warrant a new trial is a decision committed to the district court's discretion and is subject to deferential review in this court. While this court has only a cold record to rely on, the district court has the opportunity to observe witness demeanor and juror reaction to those witnesses, the kinds of subtleties that may make a particular bit of evidence more significant than the record would otherwise indicate. Therefore, we will reverse the district court's decision to grant a new trial because of newly-discovered evidence only if the district court abused its discretion. See Mumford, 814 F.2d at 329. "To find an abuse of discretion, we must conclude that 'no reasonable man could agree with the district court.' " Id. (quoting Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 831 (7th Cir.1985)).
 
 
 28
 The Treadwells do not dispute that the Johnsons' testimony was not discovered until after trial or that it was admissible, relevant, and material. Nor do they argue that Kennedy was not diligent in discovering this evidence. James and Deborah do argue that much of the testimony was cumulative and impeaching, and that the Johnsons' testimony was not likely to change the original trial's outcome.
 
 
 29
 James and Deborah correctly note that many of the statements Deborah made to her family members involve falsehoods she had already admitted at trial. For example, Deborah admitted during her testimony that she had used the name "Treadwell" when dealing with Williams and that she had introduced her friend to Williams as her sister. If this was all the Johnson family members had testified about, it would be difficult to justify affirming the district court's decision to grant a new trial even under the deferential standard of review we apply.
 
 
 30
 However, the Johnsons' testimony that Deborah had claimed not to be discriminated against, that she wanted "no part" of the suit and thought it had been dropped, and that James' father was "pushing" the suit would add to what the jury had already learned at trial. Would it have added enough to make it likely the outcome would change on retrial? It is arguable that this evidence--which one could boil down to nothing more than an admission by Deborah that she did not think she was discriminated against and that she did not think she had much of a case--would have little impact on a jury. Deborah's subjective belief that she had not been discriminated against might not be particularly convincing evidence that her belief was true. Cf. Brown v. M & M/Mars, 883 F.2d 505, 510 (7th Cir.1989). After all, the focus in determining whether discrimination occurred is on the alleged discriminator's mind, not the alleged victim's. Deborah could not read Kennedy's mind.
 
 
 31
 But it is possible to view Deborah's alleged statements as more than just evidence of her subjective belief. Deborah (not James) dealt with Williams; she saw how Williams reacted when he met James. Deborah's statements as they were presented to the jury could have been interpreted as a capsule summary of what actually happened. Deborah's additional statements, when subjected to cross-examination, could cast a different light on the application/acceptance process. An admission that "I was not discriminated against" could, under cross-examination, thus become "I never did fill out the rental application, and was never led to believe the apartment was ours. I didn't bring all the money requested, and we couldn't afford the apartment anyway. Nobody I dealt with seemed to be hostile toward James or me." Taken in this light, Deborah's statements would buttress Kennedy's story about what happened while at the same time weakening her original story. For example, such admissions could cast doubt on Deborah's original denial that she ever received an application, and the testimony of Deborah, James, and Schroeder that Williams reacted "oddly" when he met James.
 
 
 32
 This testimony might not be enough to convince us as an original matter that the outcome at a new trial would likely differ from the outcome at retrial. After all, the stark fact remained that Kennedy lied at least twice about her real reason for not renting to the Treadwells and supported this lie with false documents (i.e., the backdated leases). But we emphasize that our review is highly deferential. The district court's grant of a new trial is reversible only if no reasonable person would disagree with that order. The district court judge had the opportunity to actually see the witnesses at the liability trial; he is in a better position than we to decide which testimony is likely to be most significant to a jury and how new testimony would affect the jury's view of the other testimony. The district court could reasonably conclude that the case was close and that the Johnsons' testimony would likely tip the case toward the defendants, and that justice required a new trial. That is sufficient to justify a new trial.
 
 
 33
 The Treadwells, however, argue that we must reverse the new trial order because the district court's analysis was affected by two legal errors it made. First, the Treadwells argue that the court applied an improper standard in deciding to grant the new trial. In its opinion, the district court wrote that the Johnsons' testimony "may likely tip the scales in favor of Defendants." D.Ct.Op. at 5. The Treadwells argue that new evidence justifies a new trial only if it "will likely" change the outcome. But earlier in its opinion, the district court set out in its opinion the standard the Treadwells say is appropriate. The court's writing "may likely" rather than "will likely" was probably nothing more than a slip of the pen and does not strike us as evidence that the court applied an incorrect standard.
 
 
 34
 In any event, all of the cases the Treadwells rely upon involved motions for new trial under Rule 60(b). See, e.g., Mumford, 814 F.2d at 329-30; Peacock, 721 F.2d at 212-13; United States v. Walus, 616 F.2d 283, 287 (7th Cir.1980). The standards for granting a new trial because of newly-discovered evidence under Rule 59 are often stated to be the same as those for granting a new trial under Rule 60(b). But Rule 60(b)(2) allows a party to move to reopen a judgment up to one year after trial; Rule 59 requires a motion within 10 days. As a practical matter, one would expect the requirements for reopening a judgment to be more stringent the further in time one moves from the judgment. The possibility of achieving a more accurate outcome in a second trial diminishes as time passes and memories dim. Also, a party obtaining a judgment has more reason to feel secure about the judgment's finality as time passes (especially when the time for appealing the judgment has passed). Therefore, this court has recognized that Rule 60(b)(2), "allowing a more belated attack on a judgment than [Rule 59] requires a stronger showing." Peacock, 721 F.2d at 213; see also 7 James W. Moore and Jo Desha Lucas, Moore's Federal Practice p 60.23, at 60-198 (2d ed. 1991).
 
 
 35
 So, even if the district court was applying a slightly less stringent standard than the Treadwells say is appropriate, the court did not commit reversible error. The district court believed that the case was close and the new evidence "may likely" tip the scale for defendants. He believed justice required a new trial so a jury could consider all the evidence. That decision was within the court's power. See C. Wright and A. Miller, Federal Practice and Procedure, § 2805, at 38 ("The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice."). As we have seen, the court's decision was a reasonable decision in this case.
 
 
 36
 The Treadwells also argue that the district court misapprehended their burden of proof and that this misapprehension affected its decision to order a new trial. The court wrote that "Defendants painted a picture of a financially unsound couple who were turned down because of a likely inability to make rental payments, while Plaintiffs attempted to show rejection on grounds of race alone." D.Ct.Op. of 8/27/87, at 5 (emphasis added). It is true a plaintiff does not have to show race was the sole factor in a defendant's refusal to rent; he need only show that it was at least a motivating factor. See Selden Apartments v. HUD, 785 F.2d 152, 161 (6th Cir.1986). But in deciding whether to order a new trial, a district court is not required to decide the probable effect of new evidence only in the context of abstract legal questions. Instead, the court may--and should--analyze what effect new evidence will have in light of the actual evidence at trial and the parties' theories of the case. That is all the court was doing here. The Treadwells did not try to show that race was one of several factors--though a determining factor--in Kennedy's decision not to rent. Instead, the Treadwells tried to show that all of Kennedy's stated reasons for refusing to rent to them were lies, leaving race as the only explanation. The court was not saying the Treadwells had to prove race was Kennedy's only reason for not renting to them; he was merely recognizing their theory of the case.
 
 
 37
 Finally, the Treadwells argue that because the same jury that found Kennedy discriminated also heard the Johnsons' testimony and rejected Kennedy's argument to award only nominal damages, it necessarily follows that the Johnsons' testimony would make no difference in the outcome on retrial. But the jury at the damages hearing could not reconsider its liability finding; liability was set, and the jury had to award some damages. The jury's modest damage award is not necessarily proof that the Johnsons' testimony would not have affected its liability finding and did not prevent the district court from ordering a new trial.
 
 III.
 
 38
 The district court did not abuse its discretion by ordering a new trial. Since the Treadwells refused to go ahead with that trial, the court properly dismissed the case with prejudice for failure to prosecute. Therefore, we affirm the district court's decision.
 
 
 39
 AFFIRMED.