957 F.2d 1446
 58 Fair Empl.Prac.Cas. (BNA) 696,
58 Empl. Prac. Dec. P 41,370
UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff-Appellee, Cross-Appellant,
v.
CENTURY BROADCASTING CORPORATION and Century Chicago
Broadcasting, Ltd., Defendants-Appellants, Cross-Appellees.
 Nos. 90-3210, 90-3440.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 4, 1991.
Decided March 23, 1992.
Rehearing and Rehearing En Banc Denied
April 28, 1992.
 
 Charlie Hammel-Smith, John P. Rowe, John C. Hendrickson, Julianne Bowman, Jean P. Kamp, E.E.O.C., Chicago, Ill., John F. Suhre E.E.O.C. Office of Gen. Counsel (argued), Washington, D.C., for plaintiff-appellee.
 Roger L. Taylor (argued), Susan P. Jordan, Lisa Wetzel, Kirkland & Ellis, Chicago, Ill., for defendants-appellants.
 Before COFFEY, RIPPLE, and MANION, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Century Broadcasting Corp., through its subsidiary, Century Chicago Broadcasting, Ltd., (collectively "Century") owns a radio station in Chicago. In 1987, the station employed seven announcers, six of whom were more than forty years old and one who was only twenty-seven years old. In order to reverse the declining popularity of the station, Century hired new managers. The new managers changed the station's format and, in the process, fired all six of the announcers over forty years of age and replaced them with announcers under forty. The EEOC brought suit on behalf of four of the fired announcers against Century under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634. A jury found in favor of the EEOC as to three of the claimants, but in favor of Century as to the fourth. Century moved for JNOV or, alternatively, a new trial. The EEOC moved to amend the judgment or for a new trial for the one unsuccessful claimant. The district court denied the cross-motions, and both parties appealed. For the following reasons, we affirm in part, reverse in part, and remand the case to the district court.
 
 
 2
 * BACKGROUND
 
 A. Statutory Background
 
 3
 The ADEA makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a). ADEA protection is "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a). An ADEA plaintiff must prove " 'that he would not have been discharged "but for" his employer's motive to discriminate against him because of his age.' " Karazanos v. Navistar Int'l Trans. Corp., 948 F.2d 332, 335 (7th Cir.1991) (quoting LaMontagne v. American Convenience Prods., Inc., 750 F.2d 1405, 1409 (7th Cir.1984)); see also Aungst v. Westinghouse Elec. Corp., 937 F.2d 1216, 1219 (7th Cir.1991). The ultimate issue at trial is whether "age was a determining factor " in the employer's decision. Brown v. M & M/Mars, 883 F.2d 505, 507 (7th Cir.1989) (emphasis added); Burlew v. Eaton Corp., 869 F.2d 1063, 1065 (7th Cir.1989).
 
 
 4
 An ADEA plaintiff may either attempt to meet the burden of proof "head on by presenting direct or circumstantial evidence that age was the determining factor in his discharge," or " 'as is more common, [ ]he may utilize the indirect, burden-shifting method of proof for Title VII cases originally set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later adapted to age discrimination claims under the ADEA.' " Karazanos, 948 F.2d at 335 (quoting Weihaupt v. American Medical Ass'n, 874 F.2d 419, 424 (7th Cir.1989)). Under the indirect, burden-shifting method, ADEA plaintiffs must first establish the elements of a prima facie case. As adapted to this case, those elements are: (1) they were in the protected group (between the ages of forty and seventy); (2) their job performance met the employer's legitimate expectations; (3) they were discharged; and (4) the employer sought replacements for them. Karazanos, 948 F.2d at 335. Once the employee establishes a prima facie case,
 
 
 5
 "this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext."
 
 
 6
 Id. (quoting Weihaupt, 874 F.2d at 427); see Burlew, 869 F.2d at 1066.
 
 
 7
 If the finder of fact determines not only that the employer was liable, but also that the ADEA violation was willful, it may award "liquidated damages" in an amount equal to the amount of compensatory damages awarded. 29 U.S.C. § 626(b). A violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126, 128-29, 105 S.Ct. 613, 624, 625-26, 83 L.Ed.2d 523 (1985); see also Brown, 883 F.2d at 512; Burlew, 869 F.2d at 1064. Once liability and, as in this case, willfulness are found, the court has discretion to order equitable remedies in addition to back pay and liquidated double damages. The additional remedies include reinstatement or front pay. 29 U.S.C. § 626(b); Hybert v. Hearst Corp., 900 F.2d 1050, 1054-55 (7th Cir.1990).
 
 B. Facts
 
 8
 Century owns a Chicago radio station, FM 100 (located at 100.3 on the FM band), which was known formerly as WLOO. WLOO was a very successful station in the 1970s. Its "beautiful music format feature[d] lush instrumentals and a deliberate announcing style." Appellant's Br. at 5. The music was primarily "instrumental cover songs": songs that were originally "vocals" recorded by popular artists but were re-made as "lush, fully orchestrated, violin-driven instrumentals" designed to "be acceptable to a beautiful music format." Tr. at 605, 597. Mixed in with the instrumental songs were "at the most four vocals per hour," most of which "were not done by the original artists, it would be a Vic Damone doing a Billy Joel song or the Ray Coniff Singers doing a Tony Orlando song, that type of thing." Tr. at 597, 782. The announcing style accompanying this music was "very slow, deliberate ... low key, ... in tune with the music," and was characterized by three-to-four second "pauses that existed between the songs and existed between the elements" which were inserted "so that the listeners could enjoy the music that much more." Tr. at 606, 599.
 
 
 9
 From 1980 through 1987, the beautiful music format steadily declined in popularity, and WLOO's market share in the key 25-54 year-old demographic group declined along with it. In August 1987 there was a "corporate shakeup" and, in September 1987, the new corporate management hired Gary Parks as program director for FM 100. On September 15, Parks met with the announcers and engineers and told everyone that he wanted "to tighten the pauses between the songs" and have "a brighter, more upbeat approach." Although the music would not change, he proposed changing the "liners" so as to replace the phrase "beautiful music" with "easy listening."[1] On September 29, Parks and the acting general sales manager, Dennis Douglas, prepared a "State of the Station" report for upper-level management. This report featured observations of current problems with the station and suggestions for improvement:
 
 
 10
 I have concluded that the station has been programmed the way Beautiful Music stations have been programmed for years, thusly sounding old and lethargic. The successful operators in this format have made the transition from beautiful music to easy-listening in the listeners' minds. This is done by replacing those old canons of programming with a brighter, more contemporary feel to the station. Traditionally, beautiful music stations have been top heavy with 65+ demographics. As these listeners die off, there are no bodies to replace them. Thusly, an eroding listener base develops.
 
 
 11
 With the Chicago market being saturated with Adult Contemporary stations, there are many outlets "asking for the order." Traditionally, these stations draw 25-34 & 35-44 demographics, which leaves the 45-54 cell looking for a station that pleases their ear. FM 100 would be a consideration, but that listener does not like the "old" sound. After all, no matter what our age, we all want to be considered "hip", or "with it."
 
 
 12
 I feel there is untapped potential for growth within the 40-49 demographics that can be achieved without alienating the older folks. This can be accomplished by giving the station a younger feel.
 
 
 13
 Defendant's Ex. 14 at 3.
 
 
 14
 On January 4, 1988, James Haviland was hired as the new general manager of FM 100. Soon after he arrived, Haviland began discussing with Parks the idea of going beyond the superficial change in "liners" and actually changing the whole format of the station from beautiful music to easy listening. The easy listening format, also known as "soft adult contemporary,"[2] differs from the "beautiful music" format in both musical content and announcing style. Easy listening music consists of "virtually all vocals," "fewer strings," and original vocal artists: "Billy Joel again doing Billy Joel, not Vic Damone." Tr. at 600, 789, 802. Unlike the beautiful music format, easy listening features only "an instrumental or two an hour," and these instrumentals are "current instrumental hits done in a light jazz, new age type theme." Tr. at 600. The easy listening announcing style is "more up-beat, less laid-back," and "the pauses are gone, the songs bang right up next to each other. Sometimes a song will start to play while the other one is finishing." Announcers also back-sell or back-announce the music: "[t]hat's where they say 'you just heard Stevie Wonder and now we have Billy Joel coming up.' " Tr. at 606. In essence, the easy listening announcing style is "more conversational."
 
 
 15
 Haviland and Parks planned to make other changes to FM 100 as part of the switch from beautiful music to easy listening. The station's call letters were to be changed from WLOO to WXEZ so that the listeners would identify "EZ 100" with easy listening. Where, in the beautiful music format, the announcers had read the news and weather, separate news and weather persons were to be hired for the easy listening format. While engineers had done the physical tasks of gathering and playing the songs and commercials under beautiful music format, the new format was to be a "combo operation," with one person both announcing and engineering, or "running their own board." The sales staff was to be cut in half, from ten to five salespersons. And the program was to broadcast simultaneously over both the FM station and its AM affiliate,[3] allowing for a drastic reduction in the AM staff.
 
 
 16
 Haviland and Parks decided to implement the programming changes gradually in order to avoid alienating their current listeners and advertisers while they tried to attract additional listeners and advertisers. They planned to add one additional vocal song every even-numbered hour for a while, then add an extra vocal to every odd-numbered hour. Over the course of about nine months, this would subtly transform the program from a 4-to-14 to a 14-to-4 ratio of vocals-to-instrumentals per hour. In contrast, Haviland and Parks made personnel changes swiftly. On January 15, 1988, only eleven days after Haviland became general manager, he and Parks decided to fire six of the seven existing announcers, including: Ralph Rowland, age fifty-seven at the time; Lyndon "Dave" Adams, age fifty-five; Jack Taylor, age fifty-nine; Bruce Robbins, age forty-four; Bill Barber, age sixty-one; and Herb Graham, age sixty-five.[4] Century decided to keep the seventh announcer, Bruce Buckley, age twenty-seven, who had worked at FM 100 for less than one year. On March 15, 1988, Haviland sent to all seven announcers a form letter notifying them of their termination. These letters explained the plan to change to a "combo operation" and new format and gave the following reasons for termination:
 
 
 17
 In the past, some of you have informed us of your lack of desire and/or inability to operate your own board. Some of you have explained your inability to allot enough hours per week to work a regular on-air shift. Resultantly, we feel a number of talent changes are needed.
 
 
 18
 Plaintiff's Ex. 1 at 1. The terminations were effective three days later, March 18, 1988. Buckley was told to disregard the letter. At the same time, Century hired five new announcers: Bart Goyshnor, age thirty-four; Bill Jurek, age thirty-seven; Dave Mitchell, age thirty-one; Terry Flynn, age thirty; and Carl Gaisser, age thirty-six. On April 22, 1988, Century changed the call letters from WLOO to WXEZ. On September 30, 1988, WXEZ began the nine-month subtle replacement of instrumental music by vocal music. In June 1989, the format change was complete.
 
 C. District Court Proceedings
 
 19
 On July 28, 1989, the EEOC filed an ADEA suit on behalf of the six terminated announcers in the United States District Court for the Northern District of Illinois. In February 1990, two of the announcers, Bill Barber and Herb Graham, chose to withdraw from the suit and their claims were dismissed with prejudice. The EEOC continued on to trial on behalf of Rowland, Adams, Taylor, and Robbins.
 
 
 20
 On May 29, 1990, a jury trial commenced. In support of its prima facie case, the EEOC presented evidence that (1) Rowland, Adams, Taylor, and Robbins were in the protected age group; (2) their job performance met Century's legitimate expectations;[5] (3) they were discharged; and (4) Century sought replacements for them. The EEOC also presented evidence that the reasons for termination that Haviland listed in the termination letters were untrue: none of the announcers had told Haviland or Parks that they were unwilling or unable to operate an engineering board; and none had expressed unwillingness or inability to work a full shift. Each of the announcers testified that he had operated a combo board and could do so at FM 100. Indeed, Haviland admitted that these proffered reasons were untrue and were included in the letter only so that there would be "no hard feelings, and no specific hindrances of them seeking employment elsewhere." Tr. at 702. The EEOC also introduced evidence that Haviland had received training regarding age discrimination and knew that it was unlawful to fire someone because of age and that the law protected people as young as forty years old. The EEOC also introduced evidence that Haviland was aware that Taylor and Adams--if not Rowland or Robbins--were over forty years old. Finally, the EEOC introduced evidence that the terminated announcers in fact had the capability to work--and, in the case of Robbins and Taylor, some experience working--in the easy listening/soft adult contemporary format.
 
 
 21
 Century then introduced evidence that the reason they terminated the announcers was that they did not have the right announcing style for the new format and were too closely identified with WLOO and "beautiful music." Testimony suggested that Parks personally told the announcers that this was the reason they were being fired. Century also introduced evidence that, although the replacement announcers were all less than forty years old, the process of replacing them was not age-sensitive; Century listened to audition tapes that did not indicate the applicant's age, and it is difficult to determine a person's age simply by hearing their voice on the radio.[6]
 
 
 22
 After a seven-day trial, the jury found for the EEOC as to Rowland, Adams, and Taylor. The jury found for Century as to Robbins. The jury also found that Century's violation was willful, thus resulting in double damages. Century moved for JNOV or, alternatively, a new trial. The EEOC moved to amend the judgment or for a new trial as to Robbins. The district court denied the cross-motions and entered a memorandum opinion and order. The court held that there was sufficient evidence supporting the EEOC's prima facie case:
 
 
 23
 [T]here was testimony that FM-100's former program director began the transition from a beautiful music format to easy listening months before the successful claimants were fired, that the successful claimants were performing satisfactorily for at least seven months before they were fired in the opinion of the program manager who fired them, that the new format was not actually in place until a number of months after the firings at issue, that the program manager admitted that at least one of the successful claimants, Dave Adams, appeared capable of making the format transition, and that none of the successful claimants was given an opportunity to audition for the new adult contemporary format.
 
 
 24
 Memorandum Opinion and Order of September 5, 1990 (R. 133) at 3-4. The court also found that there was substantial evidence to support the inference that Century's proffered reasons for the terminations was pretextual. One of several factors cited by the court was the untrue explanation given in the form termination letters. Finally, with minimal elaboration, the court concluded that there was sufficient evidence to support the jury's finding of willfulness.
 
 
 25
 The court also rejected the EEOC's argument[7] that the jury's verdicts were inconsistent because the jury found for Century as to claimant Robbins. Also refusing to order reinstatement of any of the successful claimants, the court reasoned that
 
 
 26
 [r]einstatement would disrupt the operation of the station and would displace announcers currently employed by Century. Moreover, the very nature of a disc jockey's position involves unsupervised public contact.... Trial testimony indicated that present station management does not have confidence that these announcers have the style and tone appropriate for the current program format.
 
 
 27
 Id. at 8. Finally, the court refused to amend the judgment to order front pay. Century filed a timely notice of appeal from the district court's judgment following trial as well as the district court's denial of Century's motion for JNOV/new trial, and the EEOC filed a timely notice of appeal from the district court's denial of its motion to amend the judgment or for a new trial.
 
 II
 ANALYSIS
 A. Century's Appeal
 
 28
 Century challenges the district court's denial of its motion for JNOV or, in the alternative, a new trial. Because the denial of JNOV and the denial of a new trial involve different standards of review and, in this case, separate issues, we address them in turn.
 
 1. Denial of Century's motion for JNOV
 
 29
 Century argues that the district court erred in not granting its motion for JNOV because, according to Century, the EEOC failed to establish one element of its prima facie case, failed to offer substantial evidence that Century's proffered reasons for the terminations were pretextual, and failed to substantiate its allegation that Century willfully violated the ADEA.a. standard of review
 
 
 30
 This circuit has made clear that, after a full trial on the merits, the prima facie/burden-shifting analysis is no longer relevant. As the court noted in Hybert v. Hearst Corp., 900 F.2d 1050, 1054 (7th Cir.1990),
 
 
 31
 After a trial on the merits, however, the question of whether [the plaintiff] adequately made out the elements of a prima facie case fall away, and the operative issue is simply whether, viewing the evidence in its totality, [the plaintiff] sufficiently proved that age was a determining factor in [the defendant's] decision to terminate him.[8]
 
 
 32
 This court's task is thus limited to reviewing the entire record, viewing the evidence "and all reasonable inferences that can be drawn from it in the light most favorable to the prevailing party," and determining whether the jury reasonably could have believed that age was a determining factor in Century's decision to terminate Rowland, Taylor, and Adams. Id. at 1051 n. 1. This court "will only look for substantial evidence to support the jury verdict." Jardien v. Winston Network, Inc., 888 F.2d 1151, 1154 (7th Cir.1989). In doing so, this court cannot supplant its view of witness credibility for that of the jury. As we noted in Hybert, 900 F.2d at 1054, "we are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict)." See also Tennes v. Massachusetts Dep't of Revenue, 944 F.2d 372, 377 (7th Cir.1991).
 
 
 33
 b. the jury's finding that age was a determining factor
 
 
 34
 Once we move away from Century's focus on the prima facie/burden-shifting framework, we find that the heart of Century's challenge to the jury verdict is its assertion that there was insufficient evidence to support the jury's finding that age was a determining factor in the decision to fire the announcers. Century argues that the evidence more strongly supported the contrary conclusion that the decision to fire the announcers was based on Century's justified perceptions that the announcers did not have the right announcing style--a conversational style--to work successfully under the easy listening/soft adult contemporary format, and that the announcers were "identified with the failing beautiful music format." Appellant's Br. at 17.
 
 
 35
 In support of the claim that the announcers did not have the right announcing style, Century points to the fact that Parks told the announcers at the September 1987 meeting that they should have a "brighter, more upbeat approach" and sound "less laid back," and that he was going to "incorporate a central theme of easy listening as opposed to beautiful music." Tr. at 780. After supervising the announcers for the rest of 1987, Parks allegedly concluded that they "could not achieve the conversational style he needed in order to successfully implement the change to an adult contemporary format." Appellant's Br. at 17.[9] Viewing the evidence, as we must, in the light most favorable to the EEOC, we find very little support for Century's assertions. At the September meeting, Parks did not tell the announcers in explicit terms to adopt a "conversational" style. He did not tell the announcers that he was listening for those who had the right "announcing style" to make a transition to a new format. He asked the engineers, not the announcers, to shorten the pauses between the songs. And, while Parks suggested that the announcers use the phrase "easy listening" instead of "beautiful music" to describe the music, he did not suggest that the music or the format was changing. Indeed, the "State of the Station" report, which Parks completed two weeks after he met with the announcers, reveals that Parks was requesting that management change the format--apparently a decision he did not have the authority to make. In the report, Parks discussed the meeting and did not suggest that he had told the announcers that the format was changing or that they were auditioning for a new format or that they should sound "conversational." Parks did mention that he told the announcers to " 'sell' the liners, instead of just reading them." Defendant's Ex. 14 at 3. Taken as a whole, this evidence does little to support Century's suggestion that Parks gave the announcers an opportunity to try the new announcing style and discovered that they could not succeed at it. We cannot say that the jury acted irrationally in rejecting such a characterization.
 
 
 36
 Century's second proffered justification--that it fired the announcers because they were too strongly identified with the beautiful music format--also finds little support in the record. With the exception of Taylor, there was no evidence that any of the announcers were identified at all with WLOO. Rowland testified that the announcers did not mention their own names on the air except in newscasts. Taylor testified that
 
 
 37
 the style of the announcer at FM 100 was--it was essentially anonymous. The management--prior to my taking over the morning show, management said music is paramount. You people, we don't want to know your name, we don't want to know how you feel or what's going on in your personal lives or any of that. You read the bumpers, read the news. Don't try to be a personality.
 
 
 38
 Tr. at 234. Two Century sales agents testified that the announcers' personalities were not a real factor in their sales of advertising for the station. Tr. at 752-53, 762-63. Taylor, however, was apparently relatively well-known in Chicago because he had worked for twenty-seven years at WGN, from 1958 to 1984, both in radio and television. Taylor testified:
 
 
 39
 A. .... We ... changed the morning show in that it became, for all intents and purposes, not just more of the FM 100 music, but it became the Jack Taylor Show.
 
 
 40
 Q. As a result of that, were you identified with that at FM 100?
 
 
 41
 A. Yes.
 
 
 42
 Tr. at 234-35. Taylor testified that he had worked in a variety of formats while he was at WGN: he did a daily radio talk show; an evening folk music radio show; a weekend-afternoon pop music radio show; and, more visibly, he was the principal TV news anchor on the 5:00 and 10:00 news shows.[10] Similarly, the other dismissed announcers testified that they had worked in a variety of formats before and/or after their experience announcing in the beautiful music format with WLOO.[11] From this evidence, a reasonable jury could have concluded that the announcers were not so strongly identified with the beautiful music format as to justify firing them.
 
 
 43
 Moreover, there was substantial evidence to support the EEOC's contention that Haviland and Parks simply wanted younger-sounding announcers. By way of deposition testimony read to the jury, Adams testified that Parks told him that the station was "looking for a new young sound" and wanted "to attract a younger audience." Tr. at 387-89. In the "State of the Station" report, Parks said that the beautiful music format sounded "old and lethargic," was "top heavy with 65+ demographics," that the target 45-54 year-old listener "does not like the 'old' sound" because "we all want to be considered 'hip,' or 'with it,' " and that the "untapped potential for growth within the 40-49 demographics ... can be achieved by giving the station a younger feel." Defendant's Ex. 14 at 3. These statements, though subject to an "innocent" interpretation, could support an inference of age discrimination when added to the fact that the fired announcers were all over forty years old, the only announcer retained was under forty, and all the replacements were under forty.[12]
 
 
 44
 Finally, the jury could have given significant weight to the fact that the termination letters that Century sent to the announcers contained demonstrably false reasons for the firings. Century conceded the inaccuracy of the letters' claims that "some of you have informed us of your lack of desire and/or inability to operate your own board" and "[s]ome of you have explained your inability to allot enough hours per week to work a regular on-air shift." Plaintiff's Ex. 1 at 1. While Century contends that the reasons proffered in the letters were intended to avoid "hard feelings" and that, contemporaneously with the letters, the announcers were told in person that they were being terminated because of their announcing style, a reasonable jury could have inferred that the letters were a cover-up for discriminatory reasons. Viewing all the evidence in the light most favorable to the prevailing party, we find that a reasonable jury could have found that age was a determining factor in Century's decision to terminate the announcers.
 
 
 45
 c. the jury's finding of willfulness
 
 
 46
 As noted, if the finder of fact finds not only that the employer was liable but also that the discriminatory termination was willful, "liquidated damages" may be awarded. 29 U.S.C. § 626(b). Century challenges the jury's finding that it discriminated willfully against the fired announcers. We emphasize that it is not our role to second-guess the determination of the jury. Under the applicable standard of review, our review of the jury's finding of willfulness is limited: "We determine whether the evidence presented, combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." Tennes v. Massachusetts Dep't of Revenue, 944 F.2d 372, 377 (7th Cir.1991).
 
 
 47
 The ADEA does not define "willful," and our earlier decisions make it clear that the line between "willful" and "non-willful" violations is not easy to draw and is even more difficult to articulate. The Supreme Court has held that a violation of the ADEA is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126, 128, 105 S.Ct. 613, 624, 625, 83 L.Ed.2d 523 (1985); see also McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). The Court further held that a violation is not willful when an employer "acted reasonably and in good faith in attempting to determine whether their [action] would violate the ADEA." Thurston, 469 U.S. at 129, 105 S.Ct. at 625. In Thurston, the employer met this standard by meeting with its lawyers to determine the applicability of the Act to its employment policy and revising the policy in light of perceived inconsistencies with the Act. Id. The Court rejected a proposed standard that was less stringent and that would have allowed double damages when the employer was merely aware that the ADEA was "in the picture." Id. at 127-28, 105 S.Ct. at 624-25. By refusing to adopt the "in the picture" standard, the Court rejected the notion that all acts of discrimination which violate the ADEA are willful. Indeed, the Court noted that Congress did not intend for every successful ADEA case to result in double damages. Id. at 128, 105 S.Ct. at 625.
 
 
 48
 While Thurston supplies an important initial step in distinguishing "willful" from "non-willful" violations of the ADEA, it is still difficult--as Judge Flaum pointed out for the court in Burlew v. Eaton Corp., 869 F.2d 1063, 1065 (7th Cir.1989)--to make the distinction "in cases that involve a discrete employment decision directed at an individual." As Burlew notes, "we and other circuits have relied upon Title VII cases, primarily Texas Dep't of Community Affairs v. Burdine ..., to hold that, in an ADEA disparate treatment case, the plaintiff's ultimate burden is to prove that the defendant intentionally discriminated." Id. at 1066-67 (collecting cases).[13]
 
 
 49
 If a finding that age was a "determining factor" in the employer's decision ... is tantamount to a finding of intentional discrimination, and the employer knew that age discrimination is prohibited by the ADEA (as virtually all employers know), the result would be a finding of willfulness in almost every disparate treatment case.
 
 
 50
 Id. Consequently, we have noted that, given the required proof of intent in a disparate treatment case, a finding of willfulness will be justified in most such cases. Id. Indeed, we have rejected explicitly any requirement that a finding of willfulness be predicated on a determination of "outrageous conduct." See Brown v. M & M/Mars, 883 F.2d 505, 513 (7th Cir.1989) (explicitly disapproving the holding of Dreyer v. ARCO Chemical Co., 801 F.2d 651, 656-58 (3d Cir.1986), cert. denied, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987), that a finding of "outrageous conduct" is necessary before liquidated damages are appropriate). On the other hand, we have also noted that "it is not necessarily true that the Thurston standard, unadorned by an 'outrageousness' requirement, will lead to an automatic willfulness finding every time a jury finds an ADEA violation in an individual treatment case." Brown, 883 F.2d at 513; accord Burlew, 869 F.2d at 1067. For instance, as Judge Manion pointed out for the court in Brown, an employer, after reasonable and prudent inquiry, may determine, erroneously, that age is a bona fide occupational qualification for a certain position. Brown, 883 F.2d at 513. Such a misapprehension as to one's responsibilities may be grounded in a good faith misunderstanding of the law or in what our cases have termed "unconscious application of stereo-typed notions of ability." Syvock v. Milwaukee Boiler Mfg. Co., 665 F.2d 149, 155 (7th Cir.1981) (emphasis in original), overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 836 (7th Cir.1988); accord Brown, 883 F.2d at 514; Burlew, 869 F.2d at 1066.
 
 
 51
 [T]he legislative history of the ADEA suggests that the Congressional framers thought that non-willful discrimination directed towards an individual was quite possible. Unlike race discrimination, age discrimination may simply arise from an unconscious application of stereotyped notions of ability rather than from a deliberate desire to remove older employees from the workforce:
 
 
 52
 Age discrimination is not the same as the insidious discrimination based on race or creed prejudices and bigotry. Those discriminations result in nonemployment because of feelings about a person entirely unrelated to his ability to do a job. This is hardly a problem for the older jobseeker. Discrimination arises for him because of assumptions that are made about the effects of age on performance. As a general rule, ability is ageless.
 
 
 53
 Syvock, 665 F.2d at 155 (emphasis in original) (quoting 113 Cong.Rec. 34,742 (1967) (remarks of Rep. Burke)). In short, an employer could "act[ ] reasonably and in good faith in attempting to determine whether their [action] would violate the ADEA," Thurston, 469 U.S. at 129, 105 S.Ct. at 625, be mistaken in its conclusion, and then intentionally discriminate based upon age.
 
 
 54
 We already have held that a reasonable jury could have found that age was a determining factor in Haviland and Parks' decision to terminate the announcers and, therefore, that Haviland and Parks intentionally discriminated against the announcers because of their age. Therefore, our review of the jury's conclusion that Century willfully discriminated against the announcers boils down to whether a jury reasonably could have believed that Haviland and Parks knew or had reckless disregard for whether their conduct violated the ADEA. We begin by noting that Haviland testified that it had been his experience that radio stations change formats somewhat frequently and that announcers are regularly fired or replaced. Tr. 618-22. There is also substantial evidence in the record to show that Haviland and Parks were aware that such hiring and firing decisions were governed by the ADEA. Haviland testified that he was aware of the specific application of the ADEA to the business of running a radio station:
 
 
 55
 Q. At the time you made the decision, January 1988, had you had any training or indoctrination concerning the laws governing discrimination, including age discrimination?
 
 
 56
 A. Yes.
 
 
 57
 Q. Describe that for us, if you would, sir.
 
 
 58
 A. As I grew up in the business and gained responsibility for whatever company I was working for at the time, specifically at the general manager's level, it was mandatory that I become indoctrinated into that firm's policies and practices and procedures. And given the responsibility that the general manager has, certainly a review of the FCC and the EEOC and every governmental agency is a part of that.
 
 
 59
 Q. How about at WABC radio when you were there in New York City, did you have any training or indoctrination in EEO age discrimination?
 
 
 60
 A. Oh, most definitely. It was all a part of the indoctrination process.
 
 
 61
 Q. Can you please give us a little more specific description of what it was.
 
 
 62
 A. Well, they--I mean they have floors of people that walk you through all those things, through labor contracts, through governmental concerns, all of that, and you are exposed to all of that.
 
 
 63
 Q. In January 1988, Mr. Haviland, did you know that it was unlawful to fire someone over 40 if the reason was because the person was over 40?
 
 
 64
 A. Yes, if that was the reason that was wrong, and I knew that.
 
 
 65
 Tr. at 622-23. Parks testified more concisely that he, too, was aware of the ADEA's prohibitions:
 
 
 66
 Q. Prior to making the decision in January of 1988 to fire the announcers, did you know that it was a violation of the Age Discrimination in Employment Act to discriminate against an employee on the basis of age?
 
 
 67
 A. Yes.
 
 
 68
 Tr. at 870. Century did not introduce any evidence that Haviland, Parks, or any other Century manager met with the company's attorneys to inquire whether the plan to fire all of the existing announcers who were over forty and retain a twenty-seven year old announcer--without auditioning any of them under the new format--would violate the ADEA.
 
 
 69
 Therefore, from the evidence of record, the jury was entitled to conclude that Century's management was schooled in the application of the ADEA to the broadcast industry. Yet, when confronted with a recurring situation in the industry--the discharge of announcers--it proceeded to fire all announcers over forty while retaining a twenty-seven year old. The jury was also entitled to consider that, although several of the announcers had demonstrated versatility in their professional experience, none were afforded an opportunity to audition for the new format. The jury was also entitled to conclude, and apparently did, that the reasons given in the notice of discharge were pretextual. From this evidence, a reasonable jury could conclude that Century did not "act[ ] reasonably and in good faith in attempting to determine whether their [action] would violate the ADEA," and that, therefore, Century "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126, 128-29, 105 S.Ct. 613, 624, 625-26, 83 L.Ed.2d 523 (1985).
 
 
 70
 2. Denial of Century's motion for a new trial
 
 
 71
 Century also challenges the district court's denial of its motion for a new trial. Here Century renews its argument that the evidence does not support the jury verdict, and adds an argument that the jury's decision to rule in its favor as to Robbins--thus rendering apparently inconsistent verdicts--demonstrates that the verdict in the EEOC's favor as to Rowland, Adams, and Taylor was mistaken. "If Robbins was not a victim of age discrimination, then none of the announcers were." Appellant's Br. at 38.
 
 
 72
 a. standard of review
 
 
 73
 A district court presented with a motion for a new trial must determine "whether 'the verdict is against the weight of the evidence, ... the damages are excessive, or ..., for other reasons, the trial was not fair to the party moving.' " General Foam Fabricators, Inc. v. Tenneco Chems., Inc., 695 F.2d 281, 288 (7th Cir.1982) (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940)). Because the decision whether to grant a new trial is committed to the discretion of the district court, "the grant or denial of a motion for a new trial 'is not subject to review by this court, except upon exceptional circumstances showing a clear abuse of discretion.' " General Foam, 695 F.2d at 288 (quoting Stinebower v. Scala, 331 F.2d 366, 367 (7th Cir.1964)).[14] "Under the abuse of discretion standard, the proper inquiry is not how the reviewing court would have ruled if it had been considering the case in the first place, but rather whether any reasonable person could agree with the district court." United States v. U.S. Currency, in the Amount of $103,387.27, 863 F.2d 555, 561 (7th Cir.1988).[15]
 
 
 74
 b. merits
 
 
 75
 When faced with apparently inconsistent verdicts, we are required to reconcile them, if possible, rather then overturn them. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); Burlew v. Eaton Corp., 869 F.2d 1063, 1068 (7th Cir.1989) ("Turning to the question of inconsistent verdicts, we are required to reconcile the verdicts if possible."). The district court reconciled the verdicts as follows:
 
 
 76
 Robbins, the youngest of the claimants, was only 44 when he was fired and thus he was significantly younger than the other claimants. It is undisputed that Century's decision-makers did not know Robbins was over 40 when he was terminated. Robbins had an unstable employment history. He had held at least fifteen different jobs in the broadcasting industry. Tr. 277. Robbins first denied--and then was impeached with prior deposition testimony--that he was looking for another position before he was fired. Tr. 277-79. Unlike the other claimants, Robbins did not file a discrimination charge with the EEOC. Tr. 274, 652-53. After an initial denial, Robbins was impeached with deposition testimony that he did not think he had any basis for filing a discrimination charge. Tr. 274-75. The jury could rationally resolve credibility issues in favor of Century and conclude that the EEOC failed to establish by a preponderance of the evidence that age was a determining factor in the decision to terminate Robbins.
 
 
 77
 R. 133 at 6-7 (footnote omitted).
 
 
 78
 Century challenges the district court's reasoning on two grounds. First, Century argues that the district court's contention that "Century's decision-makers did not know Robbins was over 40" is unsupported by the record. Central to this dispute is Haviland's testimony on direct examination:
 
 
 79
 Q. How about Mr. Adams and Mr. Robbins and Mr. Taylor. Did you have a general idea of their ages?
 
 
 80
 A. I met them and you could form an impression.
 
 
 81
 Q. What was your impression?
 
 
 82
 A. Oh, I--Bruce Robbins I didn't know about. We were about the same age; I was only 42. And the other gentlemen I assumed were at least 40.
 
 
 83
 Tr. at 624. Also relevant is Mr. Haviland's testimony on cross-examination:
 
 
 84
 Q. Now, Mr. Haviland, you testified this morning that you knew that Jack Taylor was over 40, didn't you?
 
 
 85
 A. I was under that impression.
 
 
 86
 Q. And Dave Adams was over 40?
 
 
 87
 A. Right.
 
 
 88
 Q. Bruce Robbins had worked with you, and you knew he was about the same age.
 
 
 89
 A. You know, he was--he was close.
 
 
 90
 Q. And that meant he was over 40?
 
 
 91
 A. Well, I mean, I was 42 at the time. He could have been 39 or '8 or 45.
 
 
 92
 Tr. at 726-27. Parks' testimony is also probative:
 
 
 93
 Q. Incidentally, did you know what Mr. Robbins' age was in March of 1988?
 
 
 94
 A. No.
 
 
 95
 Q. Couldn't you tell by looking at him?
 
 
 96
 A. In his case, no.
 
 
 97
 Q. What--could you give your best estimate of what you thought his age was in March of 1988?
 
 
 98
 A. Mid-to-late 30s possibly.
 
 
 99
 Q. Possibly over 40?
 
 
 100
 A. Possibly.
 
 
 101
 Tr. at 835. From this testimony, the district court certainly had reason to conclude that "Century's decisionmakers did not know Robbins was over 40." If the jury concluded that Century was not sure whether Robbins was over forty, it is understandable that they did not find that Century discriminated against Robbins because of his age.
 
 
 102
 Century also contends that, even if the jury did not find Robbins to be a credible witness, it also did not find Century's business justifications to be credible. Because the announcers were all treated the same, Century reasons, the jury must have been wrong about the business justifications; if the jury found that Century had reason to fire one of the announcers, it should have found that Century had reason to fire all the announcers. But this argument misses the district court's point: the jury may have found that the reason Century had to fire Robbins--his lack of credibility, or his "unstable employment history"--was not true for the other announcers. As the district court reasoned, the jury could have believed that, while Century fired the older announcers because of their age, Century would have fired Robbins whether or not he was over forty.
 
 
 103
 A reasonable person could agree with the district court that the jury's verdicts are rationally consistent. Accordingly, we find that the district court did not abuse its discretion in refusing Century's request for a new trial.B. The EEOC's Cross-Appeal
 
 
 104
 The EEOC appeals the district court's denial of its motion to alter or amend the judgment to include an order of reinstatement or front pay for the successful claimants.
 
 1. Standard of review
 
 105
 The ADEA grants district courts the power to award to successful age discrimination plaintiffs additional equitable relief, including reinstatement or front pay. Hybert v. Hearst Corp., 900 F.2d 1050, 1054-55 (7th Cir.1990); McNeil v. Economics Lab., Inc., 800 F.2d 111, 118 (7th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), and overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 836 (7th Cir.1988).[16] The decision whether to award such remedies is left to the sound discretion of the trial court. Hybert, 900 F.2d at 1056; McNeil, 800 F.2d at 119. Thus, we shall not disturb the district court's decision to deny these remedies unless the district court clearly abused its discretion.
 
 2. Reinstatement
 
 106
 The district court denied reinstatement to each of the three successful claimants, but the EEOC appeals only the denial of reinstatement for Ralph Rowland.[17] The EEOC points out, and we agree, that some of the district court's reasons for denying reinstatement were unsound.
 
 
 107
 First, the district court relied upon Combes v. Griffin Television, Inc., 421 F.Supp. 841, 846 (W.D.Okla.1976), in which a television anchorman who successfully sued his employer for age discrimination under ADEA was denied the remedy of reinstatement. In Combes, there was "evidence of discord, disagreement, antagonism, conflict and suspicion between [the plaintiff and the defendant's] personnel and management, both in the past, at present, and predictably in the future." Id. The Combes court feared that this ongoing antagonism between the plaintiff and his prior co-workers and supervisors had the potential of being very destructive because "of being perceivable to the viewing audience." Id. However, as the EEOC notes, there was no evidence in this case of "discord, disagreement, antagonism, conflict [or] suspicion" between the fired announcers and their co-workers or supervisors prior to their firing, with the exception of Parks' apparent distrust that they could perform in the new format. Certainly the firing and subsequent antagonism which naturally stems from a lawsuit has worsened the relationship between Haviland and Parks and the fired announcers. Indeed, it seems the district court relied upon this factor when it pointed out that "[a]ntagonism and tension between the successful claimants and Century management are an inevitable by-product of this litigation and its consequent publicity." R. 133 at 8. But this court has stated unequivocally that "hostility common to litigation [should] not become an excuse to avoid ordering reinstatement on a general basis." Coston v. Plitt Theatres, Inc., 831 F.2d 1321, 1331 (7th Cir.1987), vacated on other grounds, 486 U.S. 1020, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1988). If "hostility common to litigation" would justify a denial of reinstatement, reinstatement would cease to be a remedy except in cases where the defendant felt like reinstating the plaintiff. Because there is no evidence of hostility in this case prior to the firings, Combes is inapposite.
 
 
 108
 Second, the district court suggested that "[t]rial testimony indicated that present station management does not have confidence that these announcers have the style and tone appropriate for the current program format." R. 133 at 8. While it is true that there was evidence to that effect, it is inconsistent with the jury's verdict; the jury must have disbelieved it or discounted it in order to find in favor of the announcers. We have held that "in deciding whether to grant equitable relief under Title VII, the district court [is] prohibited from reconsidering any issues necessarily and actually decided by the jury." Hussein v. Oshkosh Motor Truck Co., 816 F.2d 348, 355 (7th Cir.1987). Of course, the same is true with ADEA cases. The district court erred in basing its denial of reinstatement in part upon a reason that the jury rejected.
 
 
 109
 Third, the district court cited the following portion of another case to substantiate its uncertainty whether the claimants would have remained employed with FM 100 past the date on which the trial ended:
 
 
 110
 [T]estimony at trial and other record evidence introduced by the parties indicate that radio is a fickle industry in which job security for disc jockeys is quite tenuous ... it would be pure speculation to presume that plaintiff would have remained in the defendant's employ indefinitely.
 
 
 111
 R. 133 at 9 (quoting Rengers v. WCLR Radio Station, 661 F.Supp. 649, 651 (N.D.Ill.1986)). The "testimony" referred to was not introduced into evidence in the present case, and the district court cited no evidence from the present case to support the proposition cited. In fact, two of the three successful claimants had worked at FM 100 for over 10 years: Ralph Rowland had worked there for twelve years and Dave Adams had worked there for fourteen years. Even if it is true, as a general rule, that "job security for disc jockeys is quite tenuous," the district court cited no reason to conclude that Rowland, Adams, and Taylor would have lost their jobs absent age discrimination.
 
 
 112
 Nevertheless, the district court did base its decision not to reinstate the claimants on what is, under the circumstances presented here, one sufficiently strong and solid reason, which obviates the need for further proceedings on this issue. Because there were a limited number of announcing positions at FM 100 and each position was filled at the time, granting reinstatement to even one announcer would have required Century to displace a currently employed announcer. This court has held that reinstatement can reasonably be denied when "someone else currently occupies the employee's former position." Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1208 (7th Cir.1989); McNeil v. Economics Lab., Inc., 800 F.2d 111, 118 (7th Cir.1986) ("there may be no position available"), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), and overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 836 (7th Cir.1988). Here, the district court was required to make a very fact-specific and nuanced decision that, on this record, had to include among other factors the nature of the industry and the condition of this particular broadcasting corporation. We cannot disturb the court's determination that "[r]einstatement would disrupt the operation of the station and would displace announcers currently employed by Century." R. 133 at 8. Because a reasonable person could agree with the district court that, "[u]nder ... these circumstances, reinstatement is inappropriate," R. 133 at 9, the district court did not abuse its discretion in denying reinstatement to Ralph Rowland.
 
 3. Front pay
 
 113
 The district court also refused to award front pay[18]--two years of which was requested by the EEOC--to the fired announcers. The EEOC appeals this decision with respect to all three of the successful claimants. We agree that part of the district court's rationale for rejecting front pay was unsound.
 
 
 114
 First, the district court relied upon the fact that "the prevailing claimants received significant backpay awards from the jury." R. 133 at 9. Because the purpose of front pay is to compensate successful plaintiffs for "the post-judgment effects of past discrimination," Shore v. Federal Express Corp., 777 F.2d 1155, 1158 (6th Cir.1985), the jury's award for the pre-judgment effects of past discrimination is irrelevant to determining the propriety of awarding front pay.
 
 
 115
 Second, the district court also denied front pay for one of the reasons it denied reinstatement: because of "the tenuous nature and duration of [the prevailing claimants'] employment history" and the general rule "that disc jockeys do not enjoy tenured career positions or job security." R. 133 at 9. Because the court was uncertain whether Rowland, Adams, and Taylor would have remained employed for two years past the trial date, it denied the requested two years' worth of front pay. Because the district court failed to substantiate its uncertainty, as discussed above, it was not a valid reason to reject a request for front pay.
 
 
 116
 The only valid reason given by the district court for denying the front pay award was the fact that, based upon its finding of willfulness, the jury had awarded liquidated damages awards to the claimants. As we have noted before, because the purpose of an ADEA liquidated damage award is compensatory as well as punitive, this is a proper consideration in determining whether to award front pay. Tennes v. Massachusetts Dep't of Revenue, 944 F.2d 372, 381 (7th Cir.1991).[19] But this court has also stated that "[a] substantial liquidated damages award only makes front pay less appropriate if a front pay award would be highly speculative due to the lengthy period for which damages are sought and the lack of certainty that plaintiff would have remained employed during such a lengthy period." Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1205 (7th Cir.1989). In light of the fact that the EEOC only sought front pay for two years, and the district court failed to substantiate any lack of certainty that Rowland, Adams, and Taylor would not remain employed for that period, the jury's award of liquidated damages is an insufficient reason, standing alone, to deny the plaintiffs front pay after denying them reinstatement.
 
 Conclusion
 
 117
 For the foregoing reasons, we affirm the district court's denial of Century's motion for JNOV or a new trial, we affirm the district court's denial of the EEOC's request to alter or amend the judgment to include reinstatement of Rowland, but we reverse the district court's denial of front pay for Rowland, Adams, and Taylor and we remand the case to the district court for further consideration of this issue in conformity with this opinion. The EEOC may recover its costs in this court.
 
 
 118
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 119
 MANION, Circuit Judge, dissenting.
 
 
 120
 I agree with the majority's decision upholding the jury's verdict that Century is liable under the ADEA. I also join in the majority's treatment of the district court's denial of Century's new trial motion and of the EEOC's cross-appeal. However, I respectfully dissent from the majority's decision to uphold the jury's finding that Century is liable for liquidated damages because it willfully violated the ADEA.
 
 
 121
 An employer acts willfully for purposes of the ADEA only if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Trans-World Airlines, Inc. v. Thurston, 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985); see also McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 135 n. 13, 108 S.Ct. 1677, 1681, 1682 n. 13, 100 L.Ed.2d 115 (1988); Coston v. Plitt Theatres, Inc., 860 F.2d 834, 835-36 (7th Cir.1988). The employer's knowledge of the ADEA's requirements is not enough to show willfulness; even if the decision-maker is familiar with age discrimination law, his action is not willful unless he knew or was reckless about whether that specific action violated the ADEA. See Coston, 860 F.2d at 837.
 
 
 122
 Thurston held that Congress intended liability under the ADEA to be "two-tiered": not all ADEA violations are--or should be--willful. See Thurston, 469 U.S. at 128, 105 S.Ct. at 625. In Thurston, it was relatively simple to apply the willfulness standard it adopted while remaining faithful to the two-tiered liability structure, since the finding of an ADEA violation in Thurston did not depend on an inquiry into the employer's state of mind. Thurston examined a company policy that prevented pilots, after reaching age 60, from becoming flight engineers. The Court concluded that while the policy violated the ADEA, the violation was not willful because the company had adjusted the policy in accordance with its attorneys' advice. Under this standard, after finding liability (tier one), the factfinder could determine whether the employer acted with the state of mind necessary to constitute willfulness (tier two). Here, rather than reviewing a policy, we have a disparate treatment situation. As the majority notes, applying the Thurston willfulness standard while adhering to the ADEA's two-tiered liability structure is difficult. The line between willful and non-willful violations "is not easy to draw and is even more difficult to articulate." (Majority Op. at 1457.)
 
 
 123
 To draw the line between the two tiers of discrimination, it might be easier to define a violation of the ADEA that is not willful. To find age discrimination, a fact-finder must conclude that age was a "determining factor" or a "but-for" cause in the employer's decision. The language in some of our cases has equated this finding with a finding of intentional discrimination. See Burlew v. Eaton Corp., 869 F.2d 1063, 1066 (7th Cir.1989) (collecting cases). But if, in a disparate treatment case, a finding of tier one liability "is tantamount to a finding of intentional discrimination, and the employer knew that age discrimination is prohibited by the ADEA (as virtually all employers know [1], the result would be a finding of willfulness in almost every disparate treatment case." Burlew, 869 F.2d at 1067. This result, however, is contrary to Thurston 's admonition that Congress did not intend that a willfulness finding should flow automatically from every finding of age discrimination.
 
 
 124
 So when is age discrimination in an individual treatment case not willful? Despite our cases equating a finding of age discrimination with a finding of intentional discrimination, this circuit has also adhered to the position that age discrimination can be unconsciously motivated. "Age discrimination may simply arise from an unconscious application of stereotyped notions of ability rather than a deliberate desire to remove older employees from the workforce...." Syvock v. Milwaukee Boiler Mfg. Co., 665 F.2d 149, 154-155 (7th Cir.1981), overruled in part, Coston v. Plitt Theatres, Inc., 860 F.2d 834 (7th Cir.1988) (emphasis in original); see also Brown v. M & M Mars, 883 F.2d 505, 514 (7th Cir.1989); Burlew, 869 F.2d at 1066. Logically, if an employer acts because of a stereotype based on age--even if unconsciously--age can be the "but for" cause or determining factor in the employer's decision. Absent the age-based stereotype the employer would have acted differently. The majority apparently accepts Syvock's pronouncement that age discrimination can be unconscious, see Majority Op. at 1458, a position consistent with Burlew's statement that this proposition "appears to still be good law." Burlew, 869 F.2d at 1066, n. 5.
 
 
 125
 The principle that age discrimination can be unconsciously motivated provides a basis for distinguishing between willful and non-willful discrimination in disparate treatment cases. This principle is faithful to the ADEA's two-tier liability approach, yet allows for the possibility of "non-willful discrimination directed towards an individual...." Syvock, 665 F.2d at 155. To determine whether an ADEA violation was willful, we should ask: Was the employer's conduct consciously motivated by age, or was it the unconscious application of a stereotype about older workers' abilities? As we stated in Brown, "where an employer consciously and deliberately does what it knows or must know the ADEA prohibits, that employer has acted willfully." Brown, 883 F.2d at 514 (emphasis added). But "a plaintiff who proves only ... subtle and unconscious discrimination has not shown willful discrimination." Id.; see also Syvock, 665 F.2d at 155, & 156 n. 10.
 
 
 126
 To act willfully under the ADEA, an employer must know or be reckless about whether what it is doing violates the ADEA. Unconsciously motivated age discrimination does not meet this standard because the necessary knowledge that the act violates the ADEA is missing. The ADEA only prohibits discrimination because of age. If an employer really believes he is acting for a reason other than age--for example, an employee's perceived inability to adapt to new working conditions--he is not acting willfully, even if this perception results from "an unconscious application of stereotyped notions of ability," because he does not know, nor must he know, that his act violates the ADEA.
 
 
 127
 The question at this point in the case, therefore, is not whether Parks and Haviland knew what the ADEA prohibited. Nor is the question whether Parks and Haviland actually violated the ADEA. The question, rather, is whether Parks and Haviland knew or were reckless about whether they were violating the ADEA; this, in turn, boils down to whether Parks and Haviland were consciously motivated by age when they acted, or whether their action was based on the unconscious application of an age-based stereotype.
 
 
 128
 The majority approaches this inquiry, see Majority Op. at 1458, but quickly departs to focus instead on Parks' and Haviland's knowledge of the ADEA's requirements and their lack of any inquiry as to whether their contemplated action (firing certain announcers) violated the ADEA. See id. at 1459-1460. But knowledge of the ADEA's requirements by itself is not enough to show willfulness. Moreover, it would be pointless to check with a lawyer to see if firing an older person for some reason other than age violates the ADEA; anybody who knows the ADEA's requirements knows that the ADEA only prohibits firing workers because of their age. Firing older workers for some other reason is not a violation. Failure to check with a lawyer, plus tier one liability, is not enough to show willfulness, especially where the employer's decision was not consciously motivated by age. Otherwise, every challenged action an employer may take with an older employee--regardless of the employer's conscious motivation--would be with the risk that a jury may someday award the employee double damages because the employer did not first call his lawyer.
 
 
 129
 So now the ultimate question: Was the evidence here sufficient for a jury to find that Century willfully violated the ADEA? My answer is no. It is true that Century gave several different reasons for firing the older announcers and that the jury could reasonably have believed that Century was not being completely honest about its real reasons. But a finding of pretext does not in itself necessarily equate to a finding of willfulness. See Syvock, 665 F.2d at 157; Overgard v. Cambridge Book Co., 858 F.2d 371, 378 (7th Cir.1988). Keeping its youngest announcer could indicate that Century treated the older announcers less favorably than the younger one. But while this raises an inference that age somehow played a part in the decision to fire the older announcers, it does not show that age was the conscious motivation behind the decision.
 
 
 130
 The nature of Century's prevarication, moreover, cuts against an inference that Century was trying to hide consciously motivated age discrimination. Why would Century give one "false" reason (extra workload) to the announcers in its termination letter to them, and contemporaneously give a completely different "false" reason (announcing styles) for termination to three of them in person? Far from covering up any consciously illegal motivation, Century's conflicting messages would likely arouse suspicions rather than cover up any consciously illegal motivation.
 
 
 131
 As in Syvock, there was no direct evidence that age motivated Century's decision. The EEOC points to Parks' statements that he was looking for a "younger sound," and wanted "to attract a younger audience," and other similar statements. See Majority Op. at 1456-1457. But these statements must be taken in context. "Younger sound" does not necessarily mean younger announcers. Rather it is a marketing concept which targets a different (and presumably more profitable) group of listeners. As it turns out, the new announcers that Century hired were younger than 40. But there is no other evidence that Century sought out younger announcers. Other evidence cuts against this inference. The audition tapes that Parks received from prospective new announcers did not indicate their ages. The testimony from both sides was unanimous that listeners cannot tell a radio announcer's age from listening to his radio voice. A "young-sounding" older announcer would fit Century's new format better than an "old-sounding" younger announcer. Younger sound depended on an announcer's style, not age.
 
 
 132
 Moreover, the "younger audience" that Century was trying to attract with its new format was 40-54 year old listeners. See Majority Op. at 1457. If the targeted audience had been significantly younger, it would be more plausible to infer that Parks and Haviland went out of their way to hire younger announcers who were more likely to relate to this audience. However, why would Century go out of its way to seek out announcers considerably younger than its target audience?
 
 
 133
 Significantly, the announcers were not the only Century employees to lose their jobs because of Century's format change. A number of sales representatives, engineers, and employees from Century's AM station lost their jobs as well. Of a total of 24 employees that Century fired (including the announcers), 16 were younger than 40. Excluding the announcers, 16 of the other 18 employees fired were under 40. One of the sales representatives that Century retained was 70 years old. Century also retained two feature announcers, aged 52 and 60.
 
 
 134
 In short, the evidence does not reveal the kind of systematic removal of older employees that raises the inference that Century consciously sought to get rid of the older announcers because they were old. While I agree the evidence was sufficient for a jury to find an ADEA violation, I do not believe it was sufficient to show the consciously motivated age discrimination required to meet the ADEA's willfulness standard. Therefore, I respectfully dissent.
 
 
 
 [1]
 A "liner," or "bumper," is a one-line announcement such as "FM 100, your easy listening station." Liners are delivered by an announcer between songs or between songs and commercials
 The change in liners was not considered to be a change in the format of the station, just re-marketing; "you take the same box and you put a new label on it, and hopefully it will sell faster." Tr. at 96.
 
 
 [2]
 Some of the witnesses at trial appear to dispute whether "easy listening" means the same thing as "soft adult contemporary," and whether one label or the other more properly applies to the new FM 100 format. Because the station promoted the new format to the public as "easy listening" and "EZ 100" while promoting it to advertisers as "soft adult contemporary," Tr. 686-87, we will use the two names interchangeably
 
 
 [3]
 Century also owns AM 820, formerly known as WCZE and later known as WXEZ AM
 
 
 [4]
 Rowland had worked at FM 100 for twelve years; Adams had worked at FM 100 for fourteen years; Taylor had worked at FM 100 for four years; and Robbins had worked at FM 100 for less than two years. There is no evidence as to the number of years that Barber and Graham worked at the station
 
 
 [5]
 Parks admitted that, although he wanted them to sound more upbeat, the four were "good beautiful music announcers" from September 1987 to March 1988, while he was program director. Tr. at 850
 
 
 [6]
 Finally, Century introduced evidence that supported its position that the terminated announcers were independent contractors and thus outside the protection of the ADEA. This issue has not been raised on appeal, although it was a major issue at trial. One of the jury's special interrogatories reveals that the jury specifically found that the announcers were not independent contractors
 
 
 [7]
 Although the EEOC has abandoned this issue on appeal, the inconsistent verdicts are relevant to Century's appeal
 
 
 [8]
 Accord Perfetti v. First National Bank, 950 F.2d 449, 450 (7th Cir.1991); Jardien v. Winston Network, Inc., 888 F.2d 1151, 1154 (7th Cir.1989); Brown v. M & M/Mars, 883 F.2d 505, 507 (7th Cir.1989); cf. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713-14, 103 S.Ct. 1478, 1480-81, 75 L.Ed.2d 403 (1983) ("Because this [Title VII race discrimination] case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case. We think that by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination vel non.") (footnote omitted)
 
 
 [9]
 On cross-examination, Parks admitted that Adams, Robbins, Rowland, and Taylor were good--perhaps even "great"--beautiful music announcers. Tr. at 850-51
 
 
 [10]
 In addition, Taylor testified that since he left FM 100 he has been announcing for a northwestern Indiana station that has an "easy listening, adult contemporary" format. Tr. at 222. However, this assertion was challenged by Parks, who said he had listened to Taylor's station the day before and had determined that its format was beautiful music rather than easy listening/soft adult contemporary. Tr. at 811
 
 
 [11]
 Rowland testified that he had announced variety shows, big-band shows, and middle-of-the-road popular music shows. Tr. at 117-22. Adams testified at deposition, the transcript of which was read to the jury at trial, that he announced variety shows, middle-of-the-road popular music shows, and talk shows, and when he began working at WLOO, "I was instructed to tone down my delivery. I came on a little strong at first. The boss told me that I had too much of an AM sound and that I should lay back a little bit more. He wanted a softer delivery." Tr. at 357-75. Robbins testified that he worked variety shows, hard rock shows, soft rock shows, big-band shows, country and western shows, and talk shows. Tr. at 248-55
 
 
 [12]
 Cf. Rengers v. WCLR Radio Station, 825 F.2d 160, 164 (7th Cir.1987) ("Plaintiff [radio announcer] put forward evidence that his discharge resulted from a decision by WCLR's management that his age was incompatible with the 'youthful image' they thought desirable for drawing a younger audience."), vacated on other grounds, 486 U.S. 1020, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1988), and overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 836 (7th Cir.1988)
 
 
 [13]
 In Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), the Supreme Court held that a Title VII plaintiff has the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."
 
 
 [14]
 Accord Fleming v. County of Kane, 898 F.2d 553, 559 (7th Cir.1990); Cygnar v. City of Chicago, 865 F.2d 827, 834 (7th Cir.1989)
 
 
 [15]
 Accord United States v. Best, 939 F.2d 425, 429 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1243, 117 L.Ed.2d 476 (1992); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1201 (7th Cir.1989)
 
 
 [16]
 In relevant part, 29 U.S.C. § 626(b) provides:
 In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.
 
 
 [17]
 The EEOC indicates that it is seeking only to have Rowland offered the next available announcer opening. Appellees' Br. at 34. Since the EEOC never articulated this request to the district court, but merely requested reinstatement, the issue on appeal is whether the district court abused its discretion in denying reinstatement--not whether some other remedy might now be more appropriate
 
 
 [18]
 This court has defined front pay as "a lump sum ... representing the discounted present value of the difference between the earnings [an employee] would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment." McKnight v. General Motors Corp., 908 F.2d 104, 116 (7th Cir.1990) (citations omitted), cert. denied, --- U.S. ----, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991)
 
 
 [19]
 Accord Hybert v. Hearst Corp., 900 F.2d 1050, 1056 (7th Cir.1990) ("[L]iquidated damages are a relevant consideration in determining whether and how much front pay should be awarded."); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1205 (7th Cir.1989) ("[W]hile liquidated damages serve a deterrent or punitive function, Congress also intended liquidated damages to serve as compensation for a discharged employee's nonpecuniary losses arising from the employer's willful misconduct."); McNeil v. Economics Lab., Inc., 800 F.2d 111, 118 (7th Cir.1986) ("[F]ront pay may be less appropriate when liquidated damages are awarded."), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), and overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 836 (7th Cir.1988)